

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

DAVID PINKOSKI, Derivatively on Behalf of )
GENWORTH FINANCIAL, INC., )
                )
                Plaintiff, )
                )
      v. )
                )
THOMAS J. MCINERNEY, MARTIN P. )
KLEIN, WILLIAM H. BOLINDER, G. KENT )
CONRAD, MELINA E. HIGGINS, NANCY J. )
KARCH, CHRISTINE B. MEAD, DAVID M. )
MOFFETT, THOMAS E. MOLONEY, )
JAMES A. PARKE, JAMES S. RIEPE AND )
MICHAEL D. FRAIZER )
                )
            Defendants, )
                )
– and – )
                )
                )
GENWORTH FINANCIAL, INC., a Delaware )
corporation, )
                )
            Nominal )
            Defendant. )
                )

Case No.: **3:15CV463**

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**DEMAND FOR JURY TRIAL**

## INTRODUCTION

1.    This is a shareholder derivative action brought by David Pinkoski ("Plaintiff") on behalf of nominal defendant Genworth Financial, Inc. ("Genworth" or the "Company") against certain of its current and former officers and directors for breaches of fiduciary duty and unjust enrichment. These wrongs resulted in damage to Genworth's reputation, goodwill, and standing in the business community. Moreover, the Individual Defendants (as defined herein) have exposed the Company to tens of millions of dollars or more in potential liability for violations of federal securities law, subjecting Genworth to *two* federal shareholder class actions – one in this Court (the "Virginia Class Action") and the other in the U.S. District Court for the Southern District of New York (the "New York Class Action"). As discussed in detail below, both the

1

New York Class Action and the Virginia Class Action have been sustained, surviving the heightened pleading standard demanded by the PSLRA and are headed toward trial.

2.      Between November 3, 2011 and November 5, 2014 (the "Relevant Period"), the Individual Defendants caused and allowed Genworth to make false statements and report false financial results that misrepresented key aspects of the Company's business prospects and operations, particularly with regard to: 1) the Company's Australian mortgage insurance ("MI") unit; and 2) the profitability of the Company's long-term care insurance segment ("LTC"). During this time, and continuing to present, the Company lacked adequate internal controls over financial reporting and suffered from critical deficiencies in calculating its reserves, which severely damaged Genworth's operations.   False and misleading statements made between November 3, 2011 and April 17, 2012 are the subject of the New York Class Action, and false and misleading statements made between October 30, 2013 and November 5, 2014 are the subject of the Virginia Class Action.

3.      From November 3, 2011 through at least April 17, 2012 the Individual Defendants caused the Company to misleadingly tout the overall strength of the Australian economy and housing market, in an effort, albeit falsely, to avow that Genworth's Australian MI unit was stable.   Such stability was crucial for the Company as it sought to complete a planned minority 40% initial public offering ("IPO") of its Australian subsidiary. Analysts following the Company overwhelmingly viewed the IPO as a "positive," because it would "unlock" some of the value in one of the Company's best assets, and free up capital for a range of uses, including a potential share repurchase plan that would return value to Genworth's shares, which had been impacted by the poorly performing U.S. MI unit.

2

4.       The overall strength of the Australian economy and housing markets was critical to the success of the Company's IPO. Even in the wake of catastrophic flooding in the Queensland region of Australia in January 2011, the Company continued to falsely classify the Australian housing market as "solid."

5.       Preceding the IPO, Genworth would report that loss ratios in its Australian market remained stable at 45%, 48%, 48%, and 46% for Q1, Q2, Q3, and Q4 2011, respectively. On February 3, 2012, during the 4Q 11 earnings call, Genworth's Chief Financial Officer ("CFO") Martin P. Klein ("Klein") stated that "the loss ratio [for the Australia MI unit] decreased 2 points sequentially to 46%, reflecting a decline in new [mortgage loan] delinquencies. *The delinquency rate improved across all regions sequentially.*" Similarly, the February 27, 2012 10-K for FY 2011 stated that "[i]n Australia, the housing market has remained fairly stable with home prices and unemployment remaining consistent with the third quarter of 2011." Addressing the Queensland region that had been affected by flooding that occurred in January 2011, the Company's former Chief Executive Officer ("CEO") Michael D. Fraizer ("Fraizer") stated on the November 4, 2011 3Q 11 earnings call that "Australia is transitioning *as expected, absorbing the loss pressures* coming from the early 2011 Queensland flood events as well as the combined pressures of higher interest rates and living costs, an elevated currency, and lower consumer spending on some small business owners and consumers."

6.       As would become a theme for the Company, Genworth outlined in the February 27, 2012 10-K (the "2012 10-K") its procedures on delinquencies and reserves, including Genworth's management reviewed reserves, and the assumptions underlying reserve adequacy every quarter. The 2012 10-K also reassured investors that the Company had processes to ensure the timely receipt of information (including delinquencies) from its loan servicers.

3

7.      Executing the IPO remained front and center at this time, and the Individual Defendants regularly ensured the market all was fine at the Company.  On February 3, 2012, for example, both defendants Fraizer and Klein emphasized the importance of the IPO and stated that the IPO was on track. Defendant Fraizer confirmed that "[w]e have not encountered *any regulatory or market conditions* that would change that timing." As late as *March 29*, 2012, defendant Klein answered a question specifically on the timing of the IPO by stating that "[w]e're working very actively to put ourselves in a position to execute this in the second quarter [of 2012]," giving no indication that the Individual Defendants had encountered any obstacle to the IPO.

8.      In reality, however, though unbeknownst to the market, delinquencies and claims from the Queensland region, particularly those of high-risk, low-documentation loans issued in 2007 and 2008, increased sharply from 2011 through 2012. The truth about the Australian MI unit's financials was only disclosed after the Company announced that its IPO would be delayed until at least "early 2013." This announcement occurred after the market closed on April 17, 2012 and included a statement explaining that the "new timeframe primarily reflect[s] recent business performance in Australia."

9.      The market was shocked at the abrupt reversal in the Australian MI unit's financials and the announced delay for the IPO, especially when only weeks earlier, on March 29, 2012, defendant Klein had not, even slightly, indicated that economic conditions might force a delay. An April 18, 2012 Morgan Stanley analyst report noted the discrepancy between this reversal and the September 2011 Presentation, noting specifically, "*[w]hile the company had been downplaying these concerns* [about the Australian housing market], *including publishing an in-depth presentation in September 2011 in order to demonstrate the strength of its*

4

*fundamentals,* the news of accelerating progression to foreclosure and higher-than-expected severity appears to confirm investors' fears about this business." Further, a Sandler O'Neill analyst report expressed complete surprise in light of the Company's misleading prior statements about risk mitigation in the Queensland region, specifically explaining that it did not: "see any indications that this loss was evolving...We had not anticipated the flooding events would cause a loss."

10.    Similarly, an April 19, 2012 article in the *Australian Financial Review* stated that Genworth had "delivered bad news out of the blue and in the process *raised serious doubts about [its] past risk management practices.*" The article further noted that "flooding was an issue behind delinquencies rising sharply in the first quarter but it is hard to avoid the impression that the mortgage insurer has been allowing borrowers to string out their payments on hardship grounds when they were never going to be able to repay. Also, *the flooding occurred long ago in Queensland and has been well and truly dealt with by [Genworth's] major competitor.*" The article observed that the "blowout in losses [is] not typical of the LMI [lender mortgage insurance] sector in Australia over the past five years" and suspected that Genworth was "writing LMI on high-risk loans to achieve volume targets in readiness for the IPO."

11.    On the news of the IPO delay and the subsequent *first-ever reported loss* by the Australian MI unit, Genworth's stock price plummeted *more than 23%* in a single day.

12.    In April 2014, Genworth, Frazier, and Klein were named as defendants in the New York Class Action. Plaintiffs in the New York Class Action allege that defendants Frazier and Klein caused Genworth to violate federal securities laws by misleading investors regarding the financial health of the Australian MI units and reporting false financial results understating necessary reserves. By falsely assuring investors that the Australian housing market was "solid,"

defendants Frazier and Klein misled investors. On June 16, 2015 the Hon. Alvin K. Hellerstein denied defendants motion to dismiss the New York Class Action in its entirety.

13.     Poor controls and materially misleading statements, however, were not confined to the Company's Australian MI unit. Little more than a year later, the Individual Defendants again used obfuscation as a primary tool in dealing with the markets, causing Genworth to publicly state that its top executives - including Genworth's new CEO, defendant Tom McInerney ("McInerney") and defendant Klein - had, as part of a comprehensive review, closely studied "all aspects" of Genworth's LTC business and that Genworth had adequate reserves. During this time, Genworth's LTC competitors exit the market entirely.

14.     On October 30, 2013, defendant McInerney told investors that following the recent review, "we're more confident than we've ever been that [Genworth's] reserves are adequate, with a comfortable margin." At a December 2013 Presentation, defendant McInerney assured investors that the Company still had adequate long-term care reserves and margins still "remain[ed] solid." During a February 6, 2014 investor conference, defendant Klein again noted that "Genworth holds more than adequate reserves to satisfy policyholder claims." These statements regarding the adequacy of reserves were false and misleading.

15.     During this period, the Individual Defendants caused the Company to use stale data from 2010 to calculate its LTC reserves in violation of Generally Accepted Accounting Principles ("GAAP"). This out of date data produced an average claim duration of 2.2 years, and Genworth used that average duration to calculate its LTC reserves. This duration was approximately 30 percent less than the true average claim duration of roughly 3 years, known to the Individual Defendants, but willfully ignored by them. Thus, the Individual Defendants

caused Genworth to understate its costs and overstate LTC's profitability in numerous public announcements and filings.

16.     On July 29, 2014, Genworth reported disappointing financial performance from its LTC business and acknowledged it intended to engage in another review of its LTC reserve amounts.   On November 5, 2014, Genworth revealed that, despite earlier assurances to the contrary, it was materially under-reserved and that the Company needed to increase claim reserves by $531 million, which immediately caused the Company to drastically shrink its reported overall net profit of $28 million for the quarter to a surprising loss of $317 million. This information caused the Company's stock price and market capitalization to plummet more than 55 percent.

17.     Then, on February 10, 2015, Genworth posted a net loss of $760 million, or $1.53 per share.  Fueled by costs to set aside even more reserves, the loss included a charge of $478 million tied to increasing reserves on certain LTC policies issued before 1996. The Company also wrote off the remaining good will at its life insurance and LTC business, recording additional costs of $274 million.

18.     Finally, on March 2, 2015, Genworth filed with the Securities and Exchange Commission ("SEC") its 2014 Annual Report on Form 10-K.  In the 2014 Annual Report, the Individual Defendants caused Genworth to reveal that it identified a "material weakness" in its internal controls over financial reporting related to its LTC insurance unit.

19.     In August 2014, Genworth, McInerney and Klein were named as defendants in a Virginia Class Action.  Plaintiffs in the Virginia Class Action allege that defendants McInerney and Klein controlled Genworth and caused it to violate the federal securities laws by misleading investors about the profitability of the Company's core business. By falsely assuring investors

that they had closely studied "all aspects" of Genworth's LTC business and that Genworth was amply reserved, defendants McInerney and Klein misled investors. On May 1, 2015, the Hon. James R. Spencer, Senior U.S. District Judge, denied in part the defendants' motion to dismiss the Virginia Class Action, finding the plaintiff has adequately alleged violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934.

20. The Individual Defendants, as members of Genworth's Board of Directors (the "Board"), had fiduciary duties requiring them to be aware of the Company's reserves practices. The Individual Defendants knew throughout the Relevant Period that the costs of claims for long-term care had dramatically increased. The Individual Defendants had no reasonable basis to believe Genworth maintained adequate LTC reserves, especially in the face of numerous red flags (discussed herein). Rather than use current data and increase reserves to reflect actual results, as required by GAAP, defendants McInerney and Klein - whose compensation was heavily tied to LTC performance - caused or allowed Genworth to overstate its profitability by using outdated data from 2010 and earlier. Genworth only began accurately recording the value of the Company's LTC business in the second half of 2014.

21. Moreover, disclosure of the LTC business failures followed closely on the heels of the botched Australian IPO, demonstrating a consistent pattern of failed oversight by the Individual Defendants, many of whom served on the Board throughout both debacles. These Individual Defendants failed in their duty to act in the face of a known risk by allowing Genworth to issue misleading statements that benefited top executives by misrepresenting the financial position of the Company. These breaches of fiduciary duty have exposed Genworth to the risk of substantial liability through the two pending securities class actions, and have impaired the Company's reputation, goodwill and stock price.

22.     Six of the 10 members of the Board (defendants Bolinder, Mead, Moloney, Parke, Karch and Riepe) served on the Board during the conduct alleged in both the New York Class Action and the Virginia Class Action.   Plaintiff, as a shareholder of Genworth, brings these claims derivatively on behalf of the Company to remedy the wrongdoing identified herein because the Board is incapable of addressing these issues in an independent and disinterested manner.

## JURISDICTION AND VENUE

23.     This Court has jurisdiction over the claims asserted herein pursuant to 28 U.S.C. §1332.  Plaintiff and the Individual Defendants are residents of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. This action is not a collusive one to confer jurisdiction on a court which it would not otherwise have.

24.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

25.     Venue is proper in this Court pursuant to 28 U.S.C. §1391 because: (i) the Company is headquartered in this District; (ii) a substantial portion of the transactions and wrongs complained of herein, including defendants' primary participation in the wrongful acts detailed herein had an impact on this District; and (iii) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

26.     David Pinkoski ("Plaintiff") is a current shareholder of Genworth and has continuously held Genworth stock since April 2009. Plaintiff is a citizen of Michigan.

27.     Defendant Thomas J. McInerney ("McInerney") has been President, CEO, and a director of Genworth since January 2013. He has also been responsible for the Company's U.S. Life Insurance Division since July 2014. In July 2014, defendant McInerney replaced James Boyle as the CEO of Genworth's U.S. Life Insurance Division and head of its long-term care insurance business, and also maintained his title and responsibilities as CEO of the entire Company. Defendant McInerney also is a member of Genworth's Long-Term Care Steering Committee and is a citizen of Virginia.

28.     Defendant Martin P. Klein ("Klein") has been Genworth's CFO since May 2011. Klein previously served as the Company's Acting President and Acting CEO from May 2012 to December 2012. Defendant Klein also is a member of Genworth's Long-Term Care Steering Committee and is a citizen of Virginia.

29.     Defendant William H. Bolinder ("Bolinder") has been a director of Genworth since October 2010. Defendant Bolinder serves as a member of the Risk Committee and is a citizen of Maine.

30.     Defendant G. Kent Conrad ("Conrad") has been a director of Genworth since March 2013. Defendant Conrad serves as a member of the Risk Committee and is a citizen of Washington D.C.

31.     Defendant Melina E. Higgins ("Higgins") has been a director of Genworth since September 2013. Defendant Higgins serves as a member of the Risk Committee and is a citizen of New York.

32.     Defendant Nancy J. Karch ("Karch") has been a director of Genworth since October 2005 and is a citizen of New York.

33.     Defendant Christine B. Mead ("Mead") has been a director of Genworth since October 2009. Defendant Mead serves on the Audit Committee and is a citizen of Washington.

34.     Defendant David M. Moffett ("Moffett") has been a director of Genworth since December 2012. Defendant Moffett serves as a member of the Risk Committee and is a citizen of Florida.

35.     Defendant Thomas E. Moloney ("Moloney") has been a director of Genworth since October 2009. Defendant Moloney serves as the Chairperson of the Risk Committee and as a member of the Audit Committee. Defendant Moloney is a citizen of Florida.

36.     Defendant James A. Parke ("Parke") has been a director of Genworth since May 2004. Defendant Parke serves as the Chairperson of the Audit Committee and is a citizen of South Carolina.

37.     Defendant James S. Riepe ("Riepe") has been a director of Genworth since March 2006, and the Chairman of its Board since May 2012. Defendant Riepe serves on the Audit Committee and is a citizen of Maryland.

38.     Defendant Fraizer was the Company's President, CEO, and Chairman from 2004 until May 2012, resigning shortly after the truth about the Australian MI unit's financials was disclosed. Defendant Fraizer is a citizen of Virginia.

39.     Nominal defendant Genworth is an insurance company that specializes in life, long-term care, and mortgage insurance. It became a public company in May 2004, prior to which it was a subsidiary of General Electric Company. Genworth maintains its principal

11

executive offices at 6620 West Broad Street, Richmond, Virginia 23230 and trades on the New York Stock Exchange ("NYSE") under the ticker "GNW".

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duty**

40. By reason of their positions as officers, directors, and/or fiduciaries of Genworth and because of their ability to control the business and corporate affairs of Genworth, the Individual Defendants owed and owe Genworth and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Genworth in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Genworth and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

41. To discharge their duties, the officers and directors of Genworth were, and are, required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Genworth were required to, among other things:

> A. (i) properly and accurately represent to investors and analysts the true financial condition of the Company at any given time, including making accurate statements about the Company's financial health;
>
> B. (ii) ensure that the Company complied with its legal obligations and requirements, including complying with regulatory requirements and disseminating truthful and accurate statements to the investing public;

C. (iii) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

D. (iv) remain informed as to how Genworth conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

E. (v) ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

42.    Further, each officer and director of the Company owes to Genworth and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Individual Defendants had, and have, a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

### Breaches of Duties

43.    The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Genworth, the

13

absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders, which the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

44.     The Individual Defendants breached their duty of loyalty and good faith by allowing the other Individual Defendants to cause, or by themselves causing, the Company to improperly account for reserves for the Australian MI unit and LTC business, as well as issue false and misleading statements regarding the Company's reserve review process, the adequacy of its reserves, and the sufficiency of its internal controls. The Individual Defendants also violated, or failed to prevent others from violating, federal securities laws, which have resulted in, and exposed the Company to, numerous class action lawsuits. As a result of this, and other breaches of fiduciary duties, Genworth has expended, and will continue to expend, significant sums of money.

45.     Thus, the Individual Defendants, because of their positions of control and authority as officers and/or directors of Genworth, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company, which resulted in substantial harm to Genworth.

**Audit Committee**

46.     Defendant Parke is the Chairperson of the Audit Committee, which also consists of defendants Mead, Moloney and Riepe.

47.     As per the Audit Committee Charter ("Audit Charter"), the Audit Committee is tasked with assisting the Board in its oversight of the integrity of the financial statements of the Company, the Company's compliance with legal and regulatory requirements, the independence

and qualifications of the Company's independent auditor, and the performance of the Company's internal audit function and independent auditors.

48.    Under the Audit Charter, the Audit Committee has the authority and specific responsibility to, among other things:

(i)     Discuss with management and the independent auditor the annual audited financial statements and quarterly financial statements;

(ii)    Discuss with management and the independent auditor, as appropriate, earnings press releases and financial information and earnings guidance provided to analysts and to rating agencies;

(iii)   Select the independent auditor to examine the company's accounts, controls and financial statements;

(iv)    Discuss with management and the independent auditor, as appropriate, any audit problems or difficulties and management's response;

(v)     Independently and/or in coordination of the Risk Committee, oversee risks associated with financial accounting and reporting, including the system of internal control, which includes reviewing and discussing with management and the independent auditor the company's risk assessment process and management policies with respect to the company's major financial risk exposures and the procedures utilized by management to identify and mitigate the exposure to such risks;

(vi)    Discuss with management the company's overall investment portfolio and investment strategies;

(vii)   Review the company's financial reporting and accounting standards and principles, significant changes in such standards or principles or in their application and the key accounting decisions affecting the company's financial statements;

(viii)  Review and approve the internal audit functions;

(ix)    Review, with the CFO, the controller, the internal audit leader, or such others as the committee deems appropriate, the company's internal system of audit and financial controls and the results of internal audits, including significant internal audit findings;

(x)    Obtain and review at least annually a formal written report from the independent auditor delineating the auditing firm's internal quality control procedures, any material issues raised within the preceding five years by the auditing firm's internal quality control reviews, by peer reviews of the firm, or by any governmental or other inquiry or investigation relating to any audit conducted by the firm;

(xi)    Prepare and publish an annual committee report in the company's proxy statement;

(xii)   Set policies for the hiring of employees or former employees of the company's independent auditor;

(xiii)  Review and investigate any matters pertaining to the integrity of management, including conflicts of interest, or adherence to standards of business conduct as required in the policies of the company;

(xiv)  Establish policies and procedures for the review and approval of all proposed transactions with "Related Persons" (as defined in Section 11(b) of Genworth's Governance Principles);

(xv)   Establish procedures for the receipt, retention and treatment of complaints on accounting, internal accounting controls or auditing matters, as well as for confidential, anonymous submissions by company employees of concerns regarding questionable accounting or auditing matters; and

(xvi)  Meet separately on a periodic basis with management (including with the CFO and the controller), with the internal audit leader and also with the Company's independent auditors.

49.    In failing to perform these duties under the Audit Charter, the members of the Audit Committee caused substantial harm to the Company.

**Risk Committee**

50.    Defendant Moloney is the Chairperson of the Risk Committee, which also consists of defendants Bolinder, Conrad, Higgins and Moffett.

51.     As per the Risk Committee Charter ("Risk Charter"), the purpose of the Risk Committee is to assist the Board in its oversight responsibilities related to the Company's risk management policies and risk profile, including but not limited to, credit risks, insurance risks, operational risks and any other risk that poses a material threat to the viability of the Company.

52.     Under the Risk Charter, the Risk Committee has the authority and specific responsibility to, among other things:

(i)     Review and recommend annually for Board approval of risk management policies and the risk appetite of the Company;

(ii)    Receive regular reports on the efforts to implement and comply with regulatory requirements related to enterprise risk management;

(iii)   Review and oversee the control, management and mitigation processes relating to the Company's risk management policies and risk appetite;

(iv)    Review the Company's ability to assess and manage significant and emerging risks;

(v)     Review and analyze the Company's major risk exposures, strategies, processes, and policies;

(vi)    Review and oversee the internal risk function, including: (1) purpose, authority and organizational reporting lines; (2) staffing; and (3) concurrence in the appointment of the Chief Risk Officer or equivalent position;

(vii)   Periodically review and oversee the Corporation's compliance processes and policies; and

(viii)  Receive reports, as needed, regarding risks associated with litigation and investigations and/or regulatory matters involving the Company.

53.     In failing to perform these duties under the Risk Charter, the members of the Risk Committee caused substantial harm to the Company.

## FACTUAL ALLEGATIONS

I.   **DEFENDANTS MADE FALSE AND MISLEADING STATEMENTS REGARDING, AND MAINTAINED INADEQUATE INTERNAL CONTROLS OVER, THE COMPANY'S AUSTRALIAN MI UNIT**

54.   According to its public filings, Genworth has been a leading provider of mortgage insurance products in Canada, Australia, Mexico and multiple European countries. Within its International Mortgage Insurance segment, the Company's products predominantly insure prime-based, individually underwritten residential mortgage loans, also known as flow mortgage insurance, to lender servicers and banks. On a limited basis, Genworth also provides mortgage insurance on a structured, or bulk, basis that aids in the sale of mortgages to the capital markets and helps lenders manage capital and risk. Additionally, the Company offers services, analytical tools and technology that enable lenders to operate efficiently and manage risk.

55.   Since Genworth acts as a holding company for its subsidiaries and does not have any significant operations of its own, it recognizes dividends from, and payments under tax sharing arrangements with, its subsidiaries as its principal sources of cash for operating expenses, and interest and principal on borrowings. Combined, Canada and Australia paid dividends of $215 million, or 45%, of the $478 million in distributions "upstreamed" by Genworth's subsidiaries to the holding company in 2011. The Australian MI unit contributed $125 million, or more than a quarter of the total dividend amount.

**A.   The Australian IPO Was Paramount**

56.     On November 3, 2011 Genworth announced a minority 40% initial public offering (the "Australian IPO") of its Australian subsidiary scheduled for the second quarter of 2012.

57.     Analyst reaction was positive. A November 4, 2011 Credit Suisse report observed that the IPO "could fetch [Genworth] $560-720 [million] of immediate additional liquidity while also enhancing its financial flexibility." A November 4, 2011 J.P. Morgan report called the IPO a "positive catalyst" that "would enable management to monetize a major asset and could provide investors greater comfort in the value of the company's international MI franchise." The same report commented that "foreign MI business has sustained strong returns throughout the downturn as the housing markets in Canada and Australia have been relatively resilient," and specifically noted that while "[c]laims in Australia remain elevated given continued weakness in Queensland following severe flooding," "the [reported] *loss ratio held up better than expected.*"

58.     Both defendants Frazier and Klein repeatedly emphasized the importance of the IPO. On a November 4, 2011 3Q earnings call, defendant Fraizer stated that:

> *[W]e see Australia as an important business.* I think it is a good platform with good potential. Our desire has been to maintain control of our leading private MI platforms, and I'd put both Australia and Canada in those categories as they act as *a key source of earnings, capital, and returns. And certainly those benefit the holding company and the enterprise.*

> Our view is that this [IPO] transaction helps you retain those benefits but it also helps you rebalance exposures in the portfolio; it helps broaden the Australian capital base.... And it frees capital for redeployment, and when you look at our valuation, redeployment through share repurchase is quite compelling.

59.     Similarly, at the March 29, 2012 JP Morgan Insurance Conference, defendant Klein stated that:

> In recent years and looking forward the Australian and Canadian businesses have been capital generators providing dividends to the holding company. In 2011

those two businesses paid a total of $215 million in dividends to the holding company. We pursued growth in these markets in a disciplined way with sound underwriting guidelines.... *The minority IPO is one of our most important initiatives.* We're pursuing this plan in order to rebalance our mortgage insurance exposures and support future growth of the business as well as support our capital management and deployment strategies.

\*\*\*

*I would say this IPO for a number of reasons is a very, very important transaction for us.* It's important in that it helps us rebalance our exposure to housing markets, particularly in a commodity type, linked type of economy, so that's helpful from that standpoint. It also helps us generate some capital that we can hopefully use for some other purpose including maybe something for shareholders over a period of time. *So it's very important from that lens.*

60.     To set the stage for the IPO, the Individual Defendants assured the market that the Australian MI unit was stable. Addressing the Queensland region that had been affected by flooding that occurred in January 2011, defendant Fraizer stated on the November 4, 2011 3Q 11 earnings call that "Australia is transitioning *as expected, absorbing the loss pressures* coming from the early 2011 Queensland flood events as well as the combined pressures of higher interest rates and living costs, an elevated currency, and lower consumer spending on some small business owners and consumers."

61.     Reported loss ratios at the Company remained stable at 45%, 48%, 48%, and 46% for Q1, Q2, Q3, and Q4 2011, respectively. On February 3, 2012, during the 4Q 11 earnings call, defendant Klein stated that "the loss ratio [for the Australia MI unit] *decreased* 2 points sequentially to 46%, reflecting a *decline in new delinquencies. The delinquency rate improved across all regions sequentially.*" The February 2, 2012 4Q 11 earnings release specifically noted that "higher severity experience in the New Zealand run-off portfolio [were] partially offset by a decrease in new delinquencies, *including reductions in Queensland.*"

62.     The February 27, 2012 10-K for FY 2011 stated that "[i]n Australia, the housing market has remained fairly stable with home prices and unemployment remaining consistent with

the third quarter of 2011." The 10-K further reassured investors that conditions had since stabilized since the Queensland flooding:

> In the first quarter of 2011, losses began to increase driven by higher rates, lower retail spending and higher reserves for claims anticipated from the natural disasters during that quarter, particularly the flooding in Queensland. During the second and third quarters of 2011, there was an increase in the number of outstanding delinquencies and reserves as the cumulative impact of the factors noted previously exerted pressure on elements of the portfolio. *During the fourth quarter of 2011, total delinquencies decreased* but remained above 2010 levels and the rate of new delinquencies slowed. *We expect overall 2012 losses to remain near 2011 levels.*

63.     Analysts took note of the purported decrease in Queensland delinquencies. A February 3, 2012 Credit Suisse report commented on "solid operating income of $53mm, in line with our estimates, as the loss ratio decreased sequentially to 46% from 48% in 3Q (and also in 2Q), better than our 50% estimate..." By the fourth quarter in 2011, the book value of the Australian MI was $2.1b; assuming GNW sold 40% at 0.75x, the sale would generate $630mm of proceeds.

64.     Further, a February 3, 2012 JP Morgan analyst report also noted the purported stabilization of the Queensland region:

> [T]he loss ratio in Australia improved from 3Q11 as housing trends seem to be recovering.... In Australia, the loss ratio improved from 48.6% in 3Q11 to 46.0% due to fewer new delinquencies. Results in the Queensland area, which have been weak in recent quarters following severe flooding in early 2011, *also appear to be recovering*. In addition, we are encouraged by the increase in mortgage origination activity, which suggests the real estate market in Australia is recovering up after slowing earlier in the year.

**B.  The Individual Defendants Claim Robust Risk Management Procedures Exist to Facilitate the IPO**

65.     The 2012 10-K detailed risk management procedures that bolstered the Individual

Defendants' misleading statements on delinquencies and reserves, including that management

had reviewed reserves – and the assumptions underlying reserve adequacy – every quarter:

> Management reviews quarterly the loss reserves for adequacy, and if indicated,
> updates the assumptions used for estimating and calculating such reserves based
> on actual experience and our historical frequency of claim and severity of loss
> rates that are applied to the current population of delinquencies. Factors
> considered in establishing loss reserves include claim frequency patterns
> (reflecting the loss mitigation actions on such claim patterns), the aged category
> of the delinquency (*i.e.*, age and progression of delinquency to claim) and loan
> coverage percentage.

66.     The 2012 10-K also reassured investors that the Company had processes to ensure

the timely receipt of information (including delinquencies) from its loan servicers.

> *We have established processes, as well as contractual rights, to ensure we
> receive timely information from loan servicers* to aid us in the establishment of
> our estimates. In addition, when we have obtained sufficient facts and
> circumstances through our investigative process, we have the unilateral right
> under our master policies and at law to rescind coverage *ab initio* on the
> underlying loan certificate as if coverage never existed.

67.     These risk policies, and the purported stability of the Australian unit's loss

ratios for FY 11 – *i.e.*, for at least three quarters following the Queensland floods –

underpinned the misleading impression that the Australian IPO was, as the Individual

Defendants falsely asserted, on track. On February 3, 2012, defendant Fraizer emphasized the

importance of the IPO and confirmed that "we have not encountered *any regulatory or market

conditions* that would change that timing." As late as *March 29*, 2012, defendant Klein

answered a question specifically on the timing of the IPO by stating that "[w]e're working very

actively to put ourselves in a position to execute this [IPO] in the second quarter [of 2012],"

and gave no indication that the Individual Defendants had encountered any obstacle to the IPO.

Defendant Klein further reassured investors that "[w]hat we wanted to do all along is do this [IPO] transaction *from a position of strength*."

### C. The Truth Begins to Emerge About the Poor Performance of the Australian MI Unit Causing the Australian IPO to be Abandoned

68.     On the May 2, 2012 1Q 12 earnings call, Jerome Upton ("Upton"), CFO of Genworth's Global Mortgage Insurance segment, and Klein finally revealed details about the actual poor performance of the Australian MI unit in 1Q 12, which forced a delay in the Australian IPO. Upton disclosed that the Australian MI unit's loss ratio for 1Q 12 was an incredible *154%* – a drastic increase from the reported loss ratio of only *46%* in 4Q 11 (and ratios of 45%, 48%, and 48% in 1Q, 2Q, and 3Q 11, respectively). The Company was forced to acknowledge the severe property price declines in Queensland, leading to increased delinquencies and claims beginning in the second half of 2011, particularly in those loans made to small business owners and self-employed borrowers in 2007 and 2008. Defendant Klein stated that:

> In Australia, the operating loss was $21 million. *The results reflected a $53 million after-tax impact from a reserve strengthening in Australia. This was driven by the combination of accelerated processing of delinquencies in our pipeline from 2011* through foreclosure to claim along with higher current and anticipated severity that we identified as we went deeper in individual claim cases during March and updated estimates for *property price declines in certain submarkets, particularly in Queensland.* The delinquencies we are dealing with are concentrated from geographic, vintage year, and borrower profile standpoints. They are in Queensland *in the 2007, 2008 vintages* and with small business owners and self-employed borrowers.

69.     Upton added that the Queensland region had been particularly impacted by slumping housing prices, leading to increased delinquencies, foreclosures, and consequently lender claims:

> [D]uring the first quarter, we experienced higher losses primarily due to loss reserve strengthening of $82 million before taxes or $53 million after tax, which

was reviewed by independent third parties. *The major drivers of this strengthening were first, Coastal Queensland economic downturn; two, small-business self-employed borrowers in the '07 and '08 vintages*; third, the impact of lender servicing and forbearance programs; and fourth, the number of paid claims and severity.

*....[T]he first key driver of the reserve strengthening was the impact of the Coastal Queensland economic downturn on housing.* We have identified these areas as the Far North, Sunshine Coast, and Gold Coast, which are principally tourist areas. You will observe the differentiated performance in these areas *with peak to trough home price declines in double digits and even deeper declines on some of the foreclosed properties,* as well as delinquency rates above the rest of Queensland and the overall portfolio.

These areas have been hit hard by depressed tourism particularly as the Australian dollar strengthened. Lower levels of consumer and retail spending and reduced housing demand *driving home prices lower.*

70.     Upton also admitted that Individual Defendants had seen increasing delinquency

levels as early as "the second half of 2011":

**In the second half of 2011, we did see increasing delinquency levels and we did observe lender processing delays.** We began to work more closely with those lenders to improve the collection and default management techniques. It did accelerate some of the older delinquencies coming through and as those came through in the first quarter, *the claim paid counts did increase in January and February* but it was -- the March loss emergence and the average claims size, that really gave rise to our deep dive on the delinquency inventory and the extensive review that we undertook to strengthen loss reserves of $82 million.

71.     Genworth shocked the market with an abrupt about-face. The Company issued a

press release on April 17, 2012, after the market closed, and filed a Form 8-K with the SEC on

April 18, 2012, announcing that its IPO would be delayed and that the Australian MI unit was

expecting a loss for 1Q 12:

Genworth Financial, Inc. (NYSE: GNW) today announced a new timeframe for completing its planned minority initial public offering (IPO) of up to 40 percent of its Australian mortgage insurance (MI) business. Genworth is now seeking to complete the IPO in early 2013, subject to market conditions, valuation considerations including business performance, and regulatory approvals. The Australian MI capital ratio remains sound, and the company is continuing the

IPO regulatory review process. Genworth had previously targeted a second quarter 2012 IPO.

*This new timeframe primarily reflects recent business performance in Australia. For the 2012 first quarter, the company expects to report elevated loss experience in Australia as lenders accelerated the processing of later-stage delinquencies from prior years through to foreclosure and claim at a higher rate and severity than expected, particularly in coastal areas of Queensland that experienced natural catastrophes and regional economic slowdowns and among certain groups of small business owners and self-employed borrowers.* First quarter experience is anticipated to result in a modest first quarter loss in the Australian MI business. A detailed report on Genworth's first quarter financial results will be provided on the company's May 2, 2012 earnings call.

72.     In response, on April 18, 2012 Genworth's stock price plummeted *more than*

23%.

73.     The market was stunned by this admission. An April 18, 2012 Sandler O'Neill

report noted:

For some perspective, the *Australian mortgage insurance operations have never reported an operating loss. Nor did we see any indications that this loss was evolving*; we had recognized that the Australian economy had slowed. Perhaps we misinterpreted the indicators. We had not anticipated the flooding events would cause a loss.

*Additionally, the loss in the Australian MI operations brings the minority offering to a screeching halt – certainly not a good thing for shares of GNW....* In Australia, *we are expecting that the loss ratio will now be 125%, up from 45.0%,* and is a good deal worse than the 44.8% in the last quarter and the 45.2% loss ratio a year ago

74.     Similarly, an April 19, 2012 article in the *Australian Financial Review* stated that:

[Genworth has] delivered bad news out of the blue and in the process *raised serious doubts about [its] past risk management practices.*

* * *

Flooding was an issue behind delinquencies rising sharply in the first quarter but it is hard to avoid the impression that the mortgage insurer has been allowing borrowers to string out their payments on hardship grounds when they were never going to be able to repay. Also, *the flooding occurred long ago in Queensland and has been well and truly dealt with by [Genworth's] major competitor.*"

* * *

The blowout in losses [is] not typical of the LMI [lender mortgage insurance] sector in Australia over the past five years. One suspects that Genworth was writing LMI on high-risk loans to achieve volume targets in readiness for the IPO.

### D. The Individual Defendants Knew, or Willfully Ignored the Fact That, The Australian Market Was Deteriorating

75.     At the same time that Genworth, under the Individual Defendants' control, was reassuring investors that no economic conditions warranted a delay in the IPO, and as the Company continued to report stable loss ratios, internal data revealed a significant increase in claims and delinquencies in Australia.

76.     The New York Class Action alleges, based on interviews with confidential witnesses ("CW"), that Kevin Schneider ("Schneider"), CEO and President of Genworth's Global Mortgage Insurance segment, and Upton led quarterly domestic MI meetings called Leadership and Management ("L&M") meetings in Raleigh, where they would discuss Genworth's Global MI issues and update the MI employees as to how Global MI was trending. Schneider and Upton would say in these meetings that the Australian IPO was important to Genworth to free-up capital for Global MI, U.S. MI and other lines of business such as Long-Term Care, as well as to buying back Company stock to increase the value of the Company's shares. One CW described the IPO as being very important to Genworth and that the intent to have it occur in the first half of 2012 was a topic of much discussion at each of these quarterly meetings.

77.     By December 2011, the tenor of these meetings changed, when Schneider and Upton fielded a question at a meeting as to whether the IPO was still planned for the early part of 2012. The response was that the Australian MI unit had a poor quarter due to increased claims, leading to a miscalculation of reserves, and that claims were exceeding the allotted reserves. A

PowerPoint presentation during this meeting showed the increase in claims in Australia equaling around *$100-125 million.*

78.     Only two months after, a February 8, 2012 post on the *Wall Street Journal's* Deal Journal Australia blog reported that UBS, Macquarie Group and Commonwealth Bank of Australia had been given joint lead manager mandates for the IPO, joining lead manager Goldman Sachs.  In addition, the post announced that the Genworth IPO would be delayed until at least 2013, and that the Australian MI unit would post its first-ever loss in 1Q 2012, due to increased claims and delinquencies stemming from the Queensland region.

79.     The Individual Defendants would later admit, however, that they were aware of the poor performance of the Australian MI unit, which eventually led to the postponement of the IPO.  On the May 2, 2012 1Q 12 earnings call, Upton disclosed that the Australian MI unit's loss ratio for 1Q 12 was an incredible *154%* – a drastic increase from the reported loss ratio of only *46%* in 4Q 11 (and ratios of 45%, 48%, and 48% in 1Q, 2Q, and 3Q 11, respectively).  The Company was forced to finally acknowledge severe property price declines in Queensland, leading to increased delinquencies and claims beginning in the second half of 2011, caused mainly by loans to small business owners and self-employed borrowers made in 2007 and 2008.

80.     Defendant Klein added:

In Australia, the operating loss was $21 million. *The results reflected a $53 million after-tax impact from a reserve strengthening in Australia. This was driven by the combination of accelerated processing of delinquencies in our pipeline from 2011* through foreclosure to claim along with higher current and anticipated severity that we identified as we went deeper in individual claim cases during March and updated estimates for *property price declines in certain submarkets, particularly in Queensland.*

The delinquencies we are dealing with are concentrated from geographic, vintage year, and borrower profile standpoints. They are in Queensland *in the 2007, 2008 vintages* and with small business owners and self-employed borrowers.

81.    Upton also announced that the Queensland region had been particularly impacted by slumping housing prices, leading to increased delinquencies, foreclosures, and consequently lender claims:

> D]uring the first quarter, we experienced higher losses primarily due to loss reserve strengthening of $82 million before taxes or $53 million after tax, which was reviewed by independent third parties. *The major drivers of this strengthening were first, Coastal Queensland economic downturn; two, small-business self-employed borrowers in the '07 and '08 vintages*; third, the impact of lender servicing and forbearance programs; and fourth, the number of paid claims and severity.
>
> .... *[T]he first key driver of the reserve strengthening was the impact of the Coastal Queensland economic downturn on housing.* We have identified these areas as the Far North, Sunshine Coast, and Gold Coast, which are principally tourist areas. You will observe the differentiated performance in these areas *with peak to trough home price declines in double digits and even deeper declines on some of the foreclosed properties,* as well as delinquency rates above the rest of Queensland and the overall portfolio. These areas have been hit hard by depressed tourism particularly as the Australian dollar strengthened. Lower levels of consumer and retail spending and reduced housing demand *driving home prices lower.*

82.    Upton further admitted that the Genworth had seen increasing delinquency levels as early as "the second half of 2011":

> *In the second half of 2011, we did see increasing delinquency levels and we did observe lender processing delays.* We began to work more closely with those lenders to improve the collection and default management techniques. It did accelerate some of the older delinquencies coming through and as those came through in the first quarter, *the claim paid counts did increase in January and February* but it was -- the March loss emergence and the average claims size, that really gave rise to our deep dive on the delinquency inventory and the extensive review that we undertook to strengthen loss reserves of $82 million.

83.    Subsequently, the April 23, 2014 Prospectus (the "2014 Prospectus") for the Australian MI unit's long-delayed initial public offering disclosed that policies issued on high-risk low-documentation loans made to "business select" borrowers (*i.e.*, small business owners

and self-employed borrowers) in 2007 and 2008 represented an exposure to *over $12 billion* in those loans.

84.     In April 2014, Genworth, Frazier, and Klein were named as defendants in the New York Class Action. Plaintiffs in the New York Class Action allege that defendants Frazier and Klein caused Genworth to violate federal securities laws by misleading investors regarding the financial health of the Australian MI units and reported false financial results understating necessary reserves. By falsely assuring investors that the Australian housing market was "solid," defendants Frazier and Klein misled investors. On June 16, 2015 the Hon. Alvin K. Hellerstein denied defendants' motion to dismiss the New York Class Action in its entirety, finding that the alleged facts show Genworth, Frazier, and Klein engaged in a common plan or scheme to defraud investors by making false and misleading statements regarding the health of the Australian market in order to carry out the Australian IPO.

## II.     THE DEFENDANTS MISREPRESENTED THE SUCCESS OF GENWORTH'S LONG-TERM CARE INSURANCE BUSINESS WHILE THE ENTIRE INDUSTRY COLLAPSED

85.     Genworth has two business divisions: Global Mortgage and U.S. Life Insurance, which includes Genworth's LTC insurance business unit.   The Company's core business has been long-term care ("LTC").  Genworth's LTC business generated approximately $3.3 billion in revenue in 2013.

86.     The LTC insurance business requires policyholders to pay periodic premiums over the course of a number of years in exchange for future coverage in the event the policyholder needs long-term care.  LTC generally provides coverage for individuals' basic long-term care needs, including in-home care and stays at nursing home and assisted living facilities.

87.     In 2003, the LTC business began to falter.  Between 2003 and 2010, sales of LTC policies decreased more than 66 percent.  Insurance companies expressed concerns with industry data that reflected policyholders were staying "on claim" for longer.[1]  As such, the average claim became more expensive than in the past.

88.     Indeed, between 2010 and 2013, a number of major LTC insurance companies exited the LTC insurance market.  Defendant McInerney acknowledged, immediately upon assuming the role of CEO, that the Board expressed concern about the risks facing Genworth's LTC insurance business given the recent market departures.  Defendant McInerney nonetheless referred to Genworth as "the undisputed leader in the long-term care insurance industry," and declared LTC insurance one of Genworth's two "core sets of businesses."  Genworth did not exit the LTC insurance business, but, rather, remained one of the few insurers that continued to sell LTC insurance.

89.     Defendants McInerney and Klein were each heavily involved in the Company's LTC business.  Both served, and continue to serve, on the Company's Long-Term Care Steering Committee (the "LTC Steering Committee").  Throughout the Relevant Period, the LTC Steering Committee met weekly to assess the Company's long-term care insurance business.

90.     Moreover, during the Relevant Period, specifically in April 2014, defendant McInerney received a bonus of $3 million in 2013, which exceeded his 'target' payout by 50 percent,[2] in recognition of his efforts to develop a strategy for the Company's LTC insurance business.  Similarly, defendant Klein, in recognition of his collaborative approach to ensure that the other business units and investors better understood the Company's long-term care insurance

---

[1] The term "on claim" refers to policyholders who have submitted a valid claim for LTC services.

[2] At the time, it was observed that defendant McInerney "bet his job on long-term care insurance," which appeared to have paid off, at least for defendant McInerney personally.

business, received a bonus of $1.15 million in 2013, which exceeded his target payout by 48 percent.

### A. Throughout the Relevant Period, the Individual Defendants Caused Genworth to Maintain and Rely On Inadequate Reserve Practices

91.     Genworth holds money in two types of reserves to cover LTC policies it has issued: (1) for active claims, the "disabled life reserve" (the "DLR" or "claim reserve"); and (2) for issued policies where the policyholder is not on claim, the "active life reserve" (the "ALR").

92.     When Genworth issues new LTC policies, it establishes an ALR.  The ALR represents the liability for future claims from the active lives, which are the policyholders who are paying premiums and not currently on claim.  When a policyholder goes on claim, a DLR is set up and the corresponding ALR for that policyholder is released.  When a policyholder submits a valid claim, Genworth establishes a DLR representing Genworth's best estimate of the present value of what Genworth expects to pay out on that claim over time.

93.     The financial health of LTC insurance companies depends on the adequacy of these reserves.  If reserves are inadequate, funds that are accounted for elsewhere in its finances must be re-allocated to reserves, thus impacting the company's profit and liquidity adversely.  If an LTC company uses inaccurate or outdated data for the average duration of claims, the company may avoid increasing reserves and thus overstate income and understate liabilities.

94.     Generally Accepted Accounting Principles ("GAAP") and SEC rules require insurance companies to collect and review claims experience data to set appropriate reserves. GAAP specifically requires LTC insurance companies to review their experience data often, and obligates them to use current data and account for known trends in updating their reserves.

95.     In contravention to these established GAAP principles, when calculating the adequacy of its reserves before November 2014, Genworth utilized an average length of 2.2

31

years for claims, which was based on claim data from 2010. This information did not accurately reflect the true average claim duration of 2.9 years that the Company was experiencing between June 2010 and December 2013. The Individual Defendants' failure to cause Genworth to use current, up-to-date data resulted in the Company understating its average claim duration by roughly 32 percent. As such, the Individual Defendants caused and allowed Genworth to dramatically under reserve for its LTC business, causing the Company to be substantially exposed and significantly harmed.

**B. Defendants McInerney and Klein Impressed Upon Investors that Genworth, With Executive Oversight, Was Conducting a "Deep Review" of its LTC Business**

96. On July 30, 2013, Genworth announced its financial results for the second quarter of 2013 in a press release. For the quarter, Genworth reported a net operating income profit of $26 million for its LTC business. Defendant McInerney acknowledged at the time that "there's a lot of interest from analyst[s and] investors on long-term care, particularly since several of our competitors have exited the LTC business."

97. Given this "interest," defendant McInerney averred that the Company's LTC reserves were adequate, but assured that Genworth was "conducting an intense, very broad and deep review of all aspects of our long-term care insurance business." He further claimed, "[w]e're particularly looking at long-term care" and "we are looking at all aspects of that." The results of the review were expected in the fourth quarter of 2013, and were supposed to contain "more details on our long-term care balance sheet, including reserves and important underlying assumptions." Defendant Klein also commented on the importance of continuously updating and reviewing Genworth's reserve calculations, and claimed the reserves were "adequate."

32

98.     On September 25, 2013, during an investor conference, defendant McInerney touted Genworth's supposed successes in its LTC business.   Defendant McInerney again assured analysts and investors that Genworth's LTC "reserves are adequate as we've said before," and reiterated Genworth was "conducting an intense, very broad and deep review of all aspects of our long-term care insurance business." He told investors that he and defendant Klein "are very, very confident in what we say" about Genworth's LTC business and that its reserves are "adequate."

99.     Defendant McInerney explained that Genworth has a "Long-Term Care Steering Committee," internally known as the "war room team" that meets weekly and "go[es] through everything" related to Genworth's LTC business. During a December 2013 investor call regarding the Company's lengthy internal review, defendant McInerney assured investors that the results of the review presented in December 2013 would be "100% accurate" and that the Company would not tell investors "here is how we do the reserves" in December 2013 and "then down the road" tell them something different.  This assurance proved false.

### C. The Individual Defendants Caused and Allowed Genworth to Make Numerous False and Misleading Statements Related to Its LTC Reserves

100.    The Individual Defendants failed to fulfill their fiduciary duties to require Genworth to maintain adequate reserves despite assurances to the contrary.  The Individual Defendants similarly caused and allowed Genworth to issue misleading information to investors that omitted material information by: (1) claiming Genworth conducted a complete and thorough review of the Company's LTC reserves and reserve processes; (2) claiming Genworth used current claim data to perform the review; (3) claiming Genworth concluded based on the review that LTC reserves were adequate; (4) issuing financial statements that were inaccurate and not prepared in accordance with GAAP; and (5) claiming to have implemented the necessary internal controls to ensure that the Company's reserves were based on a thorough review of current claim

data.  Investors would eventually learn there was no reasonable basis supporting the accuracy of these statements, and that the Company lacked adequate internal controls to protect against these corporate failures.

### 1. On October 30, 2013, Defendant McInerney Suggests Genworth's Ongoing Review Of Its LTC Business Demonstrates Reserves Are Adequate

101.     On October 30, 2013, Genworth announced its financial results for the third quarter of 2013.  For the quarter, Genworth reported a net operating income of $41 million for its LTC business.  During an investor conference the same day, defendant McInerney told investors Genworth's 2013 LTC insurance review was "largely completed" and again stated the review was an "intensive, very broad and deep review of all aspects of [Genworth's] long-term care business [,which began] about 4 months ago."  Defendant McInerney specifically stated "[t]he first area of focus for us was our reserving."  He said that *"we have been assessing our long-term care reserves under both GAAP and statutory reporting, and determining whether to make any changes"* (emphasis added).

102.     Defendant McInerney described the review as "a complete overall review of the balance sheet and the reserves" that "consider[ed] all important aspects," including "assumptions, best estimates and also a detailed review of our statutory reserves."  He concluded that "after an extensive review, we are even more confident that GAAP and statutory reserves are adequate, with a comfortable margin for future deterioration."

103.     A UBS analyst asked why defendant McInerney had such a high "level of confidence" in the adequacy of Genworth's reserves.  In response, defendant McInerney noted his personal involvement in the reserve review:

> [A]s I said, we did, over the last four months a very thorough, deep, broad review of the long term care business, looking at everything.  Marty and I have been

34

working with Pat and his team to look at every aspect, both new business reserves, the old book, and looking at the old book by policy year. So we've done an extensive review. And while we have been saying for some time that we believe the reserves were adequate with a margin. We're now saying, or I said today, that after this four month extensive review, we're more confident than we've ever been that the reserves are adequate, with a comfortable margin.

104.    On the day of the conference, securities analysts at Sandler O'Neill published a report explaining that Genworth had "previewed some of the information [they] will share on [their] investor call [in December]," and "[i]n short, management has looked closely at its reserves and has concluded that they remain adequate."

105.    On October 31, 2013, in an article titled "Genworth CEO More Confident Than Ever On Long-Term Care Reserves," the industry publication *SNL Insurance Daily* highlighted that defendant McInerney had "dismissed the notion raised by 'some analysts and investors' regarding the potential for Genworth to take a significant long-term care reserve charge." UBS expressed a similar view in an analyst report that the market's expectation, based on the Company's representations, is that "Genworth will conclude that its long-term care reserves are adequate."

106.    Defendant McInerney's statements during the October 30, 2013 investor conference regarding the adequacy of the nearly finished review were false and misleading when made. The review was not "a very broad and deep review of all aspects of long term-care insurance business." Genworth did not examine "[t]he assumptions, best estimates and also a detailed review of [their] statutory reserves." Nor did Genworth "look at every aspect, both new business reserves [and] the old book...." Rather, as the Individual Defendants admitted in September 2014, "[t]he last time [Genworth] did a major reserve review including the disabled life reserve was in 2012," which was more than a year before the October 30, 2013 investor conference.

107.    Egregiously, the Individual Defendants caused the Company to later admit that the review from 2012 was "really based on experience that we had up through about 2010." In other words, the data used and relied upon did not reflect the more than three years of "experience" that came before the October 30, 2013 investor conference. Indeed, it did not include data from the nearly 200,000 claims Genworth processed during that time. Thus, the 2013 review used stale, outdated information to calculate reserves and to determine the sufficiency of the Company's cash on hand. When the correct metrics were applied, the Individual Defendants were forced to acknowledge that more than $1.5 billion would be wiped off the Company's books.

108.    The Individual Defendants knew well before the October 30, 2013 conference that the average length of Genworth's claims was approximately 3 years, but nonetheless caused or allowed Genworth to use an outdated figure to set reserves during the Relevant Period. The Individual Defendants would eventually do an about face. No longer capable of making certifications attesting to the adequacy of the Company's internal controls, the Individual Defendants would later admit that Genworth lacked adequate means to protect against such a fundamental accounting error.

### 2.  On December 4, 2013, Genworth Announces the Official Results of Its Neither Intensive, Broad Nor Deep Reserve Review

109.    At an investor conference on December 4, 2013, which focused in large part on the results of Genworth's much discussed "very intensive, broad and deep review of [its LTC] business" announced just seven months prior, defendants McInerney and Klein stated that the review confirmed Genworth had "adequate long-term care reserves, with a margin for future deterioration." Defendant McInerney explained the "long-term care review considered all important aspects of the business."

110. Defendants McInerney and Klein then referred investors to a series of PowerPoint slides entitled "Long-Term Care Insurance Review" (the "December 2013 Presentation"). The slides represented that the data underlying the Company's reserve review was based on a thorough review of current claims experience data. The slides claimed that the data was "as of September 30, 2013" unless otherwise noted.

111. Defendant McInerney underscored, "the most important point I want you to take away from today's presentation is that long-term care insurance must be managed proactively with annual reviews of experience," and stated Genworth had "processed over 190,000 claims to date, which gives us our own credible data." He further stated that "[a] key focus has been on assessing our reserving process, and the assumptions used to establish both the active and disabled life reserves."

112. The December 2013 Presentation indicated that, looking at the Company's "data as of September 30, 2013," Genworth had adequate LTC reserves and margins still "remain[ed] solid" even if certain adverse trends were applied. For example, the Individual Defendants misrepresented the Company's data by indicating that its reserves were adequate, with a comfortable margin, even if the Company assumed "lower lapse rates" and "less morbidity improvement," resulting in longer average claims.

113. During the December 2013 Presentation, defendants also touted the Company's internal controls. Defendant McInerney stated Genworth had "refined and improved [its] reserving, underwriting, and risk-management processes, based on analyzing and using our significant data on consumers, underwriting and claims." Defendant Klein similarly noted during the December 2013 Presentation that Genworth maintains "very credible experience on 190,000 claims that we look at."

114.    At the close of the December 2013 Presentation, defendant McInerney reiterated that the presentation was based on his personal involvement in Genworth's comprehensive review of its LTC insurance business: "I want you to know that [defendant Klein] and I have spent enormous amounts of time, with weekly meetings with the team" and we "really dug into all this and all these numbers" and, as a result, "underst[ood] how it all works and how all of the risk works."

115.    The market reacted favorably to the Company's December 2013 Presentation. Analysts at Macquarie highlighted in a December 4, 2013 report that "the Company concluded both GAAP and statutory reserves were adequate with a margin for adverse deviation." Macquarie analysts also later noted that, through its December 2013 Presentation, "[t]his management team has established credibility."  Morgan Stanley issued an analyst report on December 4, 2013 that adopted Genworth's misrepresentations and applauded the Company for having "provid[ed] details behind [its] previously disclosed conclusions that reserves for long-term care remain adequate with a sufficient margin."

116.    UBS analysts similarly concluded "today's presentation gives us some additional comfort in the adequacy of [Genworth's long-term care] reserves." UBS noted that it was positively "surprised" by Genworth's reserve analysis, in light of the fact that its "peers such as [MetLife, Prudential and Unum] . . . felt the need to exit the business (with two of the three taking LTC-related charges)." Sandler O'Neill's analysts likewise concluded the "analysis presented by Genworth should allay investor concerns over potential adverse reserve development."

117.    On December 4, 2013, the Company's stock price closed at $15.25 per share, nearly reaching its highest price in 40 months.

118.    The next day, on December 5, 2013, the Company sought to raise $400 million through a public debt offering. Moody's assigned the debt securities a rating of "stable" due to the Company's balance sheet following the reserve review.

119.    Unbeknownst to the market at this time, the statements made during the December 2013 Presentation were false and misleading.  Investors would eventually learn that the statements made during the December 2013 Presentation, including those pertaining to how Genworth had conducted the promised "deep" review of the Company's reserves in advance of the December 2013 Presentation, were, in fact, wrong.  The Company, by way of the Individual Defendants, eventually admitted: (i) Genworth's most recent in-depth reserve review was conducted in mid-2012, more than a year earlier; (ii) the 2012 review was based on outdated experience data from May 2010, more than three years earlier; and (iii) the Company's actual past three years of experience data showed Genworth immediately needed to increase its reserves by more than $500 million. Further, defendants McInerney and Klein reaped lucrative bonus awards while they, and the other Individual Defendants, caused Genworth to artificially preserve its investment grade credit and debt ratings in advance of its December 2013 secondary stock offering.

120.    The Company would also eventually admit the data used for the December 2013 Presentation was not credible.  Defendant Klein stated during a November 6, 2014 investor conference that even the 2012 review lacked "enough experience in which to base assumptions for claims in the later durations."  Genworth's financial statements, income, profit and earnings-per-share figures were, thus, materially misstated and failed to comply with GAAP.  Genworth's internal controls were ineffective.

### 3. Genworth Reports Financial Results on February 5, 2014 and the Individual Defendants Continue to Misrepresent Genworth's LTC Reserves As Being Adequate

121.    On February 5, 2014, the Company reported its financial results for the fourth quarter of 2013. Its press release quoted defendant McInerney, who stated that the Company's "fourth quarter [...] 2013 results were strong and [that] we are particularly pleased with the progress in improving our long term care insurance business." For the quarter, Genworth reported $42 million of net operating income from its LTC insurance business, which was an astounding six times more than the same quarter the previous year.

122.    That same day, during a conference call discussing the Company's 4Q 13 results, defendant McInerney stated "one of the Company's key achievements for 2013" was that Genworth's management had "completed a very intensive, broad and deep review of the long-term care business and balance sheet." Defendant Klein chimed in, stating that "Genworth holds more than adequate reserves to satisfy policyholder claims."

123.    The statements made during the February 5, 2014 conference regarding the thoroughness of the recently concluded review, the Company's financial results and the adequacy of its reserves were again false and misleading when made, as they omitted material facts only later admitted in September 2014. Specifically missing was the fact that "[t]he last time [Genworth] did a major reserve review including the disabled life reserve was in 2012," which was nearly two years before the February 5, 2014 conference. The Company also admitted, belatedly, that the review from 2012 was "really based on experience that we had up through about 2010," which was nearly four years before the February 5, 2014 conference.

### 4. Genworth's March 3, 2014 Form 10-K Continued to Falsely Claim the Company Had Sufficient Reserves

124.    On March 3, 2014, Genworth filed its 2013 Annual Report on Form 10-K, which was personally signed by defendant McInerney.  Defendant McInerney also signed the 10-K as attorney-in-fact for defendants Bolinder, Conrad, Karch, Higgins, Mead, Moffett and Riepe.   In the Company's 2013 Form 10-K, the Individual Defendants, again, emphasized the quality of Genworth's reserves and the strength of its internal controls.   In addition, the Form 10-K explained "our management is responsible for establishing and maintaining adequate internal control over financial reporting for our company."   The Individual Defendants caused and allowed Genworth to misrepresent that it had reviewed the most current claims experience data and adjusted reserves accordingly.  Further, the Individual Defendants caused, or allowed, Genworth to assure investors that "[w]e regularly review our reserves and associated assumptions as part of our ongoing assessment of our business performance and risks," and that "[t]he methods of determining such estimates and establishing the reserves are reviewed continuously and any adjustments are reflected in operations in the period in which they become known."

125.    As the Company also eventually admitted, the review from 2012 (nearly two years before they filed the Form 10-K with the SEC) was "really based on experience that we had up through about 2010" (nearly four years before they filed the Form 10-K).  As noted in the 2013 Form 10-K itself, Genworth's claims experience consistently showed its average claim duration to be approximately 3 years and not the 2.2-year figure used by Genworth to calculate its reserves.

126.    In connection with the Form 10-K, defendants McInerney and Klein each signed Internal Controls Certifications as well as certifications pursuant to Section 302 of the Sarbanes-

Oxley Act of 2002. In so doing, defendants McInerney and Klein certified that the Company's financial results were reported in compliance with GAAP, and that Genworth's internal controls were effective and functioning properly. Specifically, the certifications acknowledged that the Company's top officers were responsible for ensuring that the Company had "effective" internal controls that "provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles." Defendants McInerney and Klein represented, by signing SOX Certifications, that they "evaluate[d the] estimates used and adjust[ed] the additional liability balance, with a related charge or credit to benefit expense, if actual experience or other evidence suggests that earlier assumptions should be revised." *See* ASC-944-40-35-9.

127. These certifications provided further assurances that management had evaluated the Company's internal controls and determined them to be effective as of December 31, 2013, which was approximately four weeks after the December 2013 Presentation. On the subject of internal controls, the 2013 Form 10-K stated:

> Our management is responsible for establishing and maintaining adequate internal control over financial reporting for our company. With the participation of the Chief Executive Officer [defendant McInerney] and the Chief Financial Officer [defendant Klein], our management conducted an evaluation of the effectiveness of our internal control over financial reporting.... Based on this evaluation, our management has concluded that our internal control over financial reporting was effective as of December 31, 2013.

128. The SOX Certifications signed by defendants McInerney and Klein also misrepresented the Company's financial statements, suggesting that they were accurate and prepared in accordance with GAAP. The SOX Certifications provided, in relevant part:

> 1. I have reviewed this annual report on Form 10-K of Genworth Financial, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

> a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

> b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

> c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation....

129.    The Individual Defendants later admitted Genworth "did not have adequate controls designed and in place to ensure that we correctly implemented changes made to one of

our methodologies as part of our comprehensive long-term care insurance claim reserves review completed in the third quarter of 2014," which renders the SOX Certification statements false and misleading.

130.    Moreover, the Individual Defendants caused the Company to fail to meet GAAP requirements.  Under GAAP, "an insurance entity shall regularly evaluate estimates used and adjust the additional liability balance, with a related charge or credit to benefit expense, if actual experience or other evidence suggests that earlier assumptions should be revised." *See* ASC-944-40-35-9. Genworth did not conduct a deep and thorough review of its reserves in 2013, and its prior 2012 review used stale data from 2010 that did not account for known and material changes in Genworth's claims experience.

131.    Thus, despite the numerous red flags, the Individual Defendants failed in their duties to ensure management actually "establish[ed] and maintain[ed] adequate internal control over financial reporting" as of December 31, 2013.

132.    In addition, contrary to the Individual Defendants' misrepresentation that the 2013 Form 10-K did "not contain any untrue statement of a material fact" and "fairly present[ed] in all material respects the financial condition [and] results of operations" of Genworth, the 2013 Form 10-K materially misstated Genworth's key financial metrics. The 2013 Form 10-K and Genworth's other financial statements issued during the Relevant Period dramatically understated the Company's operating income and reserves.

### 5.  Defendants Misled Investors by Causing Genworth to Issue the April 2014 Letter to Shareholders and Relied on False Information When They Approved Executive Compensation During Genworth's May 2014 Annual Meeting

133.    Defendant McInerney made false and misleading statements in the Company's April 2014 letter to shareholders, and during a May 15, 2014 annual shareholder meeting to vote

on the election of directors and approve defendant McInerney's and Klein's executive compensation (the "Annual Shareholder Meeting"), shareholders relied on materially false and misleading information. In Genworth's April 2014 letter to shareholders, signed by defendant McInerney, the Company identified as one of the "year's highlights" that "[i]n our LTC [i.e., long-term care] insurance business, we completed a very intensive, broad and deep review of the business." During the May 2014 annual shareholder meeting, defendant McInerney also stated that one of the "achievements" made in 2013 "was in our long-term care insurance business [in which] as you know, we completed a very intense, broad and deep review of the business."

134. Regarding McInerney's 2013 compensation, the Proxy Statement noted:

> Under Mr. McInerney's leadership, the company also made significant progress in our strategy to rebuild stockholder value, which included the following areas of focus: repositioning the business portfolio, improving business performance, and supporting company financial flexibility. Other key factors taken into consideration in determining Mr. McInerney's annual incentive award include his contributions toward:
>
> - developing, implementing and communicating to investors a strategy to improve performance of our long-term care insurance business;
>
> - executing strategies for holding company cash accumulation, allocation and deployment to improve our financial flexibility;
>
> - implementing improved risk management strategies and monitoring processes, including processes to manage new business pricing objectives; and
>
> - improving business performance through improved organizational efficiency and reductions in expenses.

135. Based on the above factors, and after considering input from the Board, the Compensation Committee approved an annual incentive award of $3,000,000 for Mr. McInerney, or 150% of his targeted amount, for 2013.

136.    Similarly, defendant Klein was awarded 148 percent of his targeted bonus amount, or $1,150,000, based in part on the Company's financial results significantly exceeding targets and for "collaborating with our businesses and our investor relations function to improve investor understanding of our long-term care insurance business."

137.    Defendant McInerney's statements in the April 2014 letter to shareholders and during the May 2014 Annual Shareholder Meeting repeated many of the same false and misleading statements made throughout the Relevant Period. The statements about the scope of the review were intended to mislead investors and provide false assurances that, based on all the information available to them, Genworth remained confident in the adequacy of its reserves. The Individual Defendants would eventually admit Genworth had not conducted a major reserve review since 2012, and that the 2012 review was based on data only through May 2010. Thus, the data used did not reflect the Company's actual claim experience in violation of GAAP. Egregiously, beyond providing an incomplete and non-representative account of the Company, the erroneous data operated to ensure defendant McInerney and Klein received their substantial compensation awards discussed herein.

### D.  The Individual Defendants Begin to Acknowledge the Misleading Statements, Internal Control Deficiencies and Accounting Failures After Admitting Genworth Faced Huge Losses in its LTC Business

138.    On July 29, 2014, the Company announced its financial results for the second quarter of 2014. Genworth's net operating income for its LTC business during the quarter was $6 million – approximately 85 percent less than the three prior quarters and well below expectations. The loss was attributed to "significantly higher" losses incurred on "older blocks of business." The claims on LTC policies were described as more "severe" since the duration of the claims was longer than what Genworth's reserve calculations reflected.

46

139.    The Company separately announced that the recently appointed CEO of Genworth's U.S. Life Insurance Division and head of its LTC business, James Boyle, was leaving the Company immediately. Defendant McInerney planned to assume the role vacated by Boyle since he had been "working closely with [Boyle] and his team on developing the new Genworth long-term care business model."

140.    On July 30, 2014, Genworth held an investor conference to discuss its quarterly results for its second quarter. At the conference, defendant McInerney acknowledged that "long-term care operating performance of $6 million was well below expectations." Investors were surprised by how dramatically the longer duration of claims and increased claim related expenses for LTC care impacted the Company's results given the recent 2013 LTC review.

141.    Despite repeatedly telling investors the 2013 LTC review was a broad, intensive review looking at all aspects of the LTC business, defendant Klein finally admitted, for the first time, that Genworth's 2012 review had been "really based on experience that we had up through about 2010." Defendant Klein also admitted that Genworth "last performed an in-depth DLR review in the third-quarter of 2012." Defendant McInerney then admitted that the December 2013 Presentation had been limited to "overall margins," which had not included a complete review of the Company's DLR. Defendant McInerney suggested "maybe it's our fault" that "there [wa]s confusion" on the part of investors "between what we did in December [2013] and what we are seeing now."

142.    When defendant McInerney stated, at the July 30, 2014 conference, that the review described in detail during the December 2013 Presentation had been limited to "overall margins" and had not included a review of Genworth's disabled life reserves, he contradicted numerous prior statements about the broad scope of the Company's LTC review, including:

(i)     We are conducting an intense, very broad and deep review of all aspects of our Long Term Care Insurance business;

(ii)    We began an intensive, very broad and deep review of all aspects of [our] long-term care insurance business about 4 months ago;

(iii)   In our review of the long-term care business, we have been considering all important aspects and how we are managing the business. The first area of focus for us was our reserving;

(iv)    We did, over the last four months a very thorough, deep, broad review of the long term care business, looking at everything. Marty and I have been working with Pat and his team to look at every aspect, both new business reserves, the old book, and looking at the old book by policy year; and

(v)     Our long-term-care review considered all important aspects of the business, and the four key risks that need to be managed.... A key focus has been on assessing our reserving process, and the assumptions used to establish both the active and disabled life reserves.

143.    Defendants McInerney and Klein further stated they would begin a "detailed review of the associated claim reserve assumptions, methodology and process" --- the same review they frequently – yet falsely – claimed that they conducted in advance of the December 2013 Presentation. The Company, at the direction of the Board, proclaimed that it planned on completing and disclosing the results of its new review during another investor conference in November 2014. In the meantime, defendant McInerney warned: "We are losing money, a significant amount of money."

144.    Nonetheless, defendant McInerney falsely downplayed the extent of the issue, indicating the upcoming 2014 review would be limited to just 50,000 policies that were part of the Company's disabled life reserves, and assured the market that it would not impact the Company's Active Life Reserves or margins. Defendant McInerney stressed that "we have a

much larger active life reserve, which is the reserve we hold for the bulk of the 1.2 million policyholders, and that reserve is about five times [larger than] the [disabled life reserves]." Defendant McInerney stated "I think what you [analysts] all seem to be missing is a very big point: This is an issue around our claim reserve." His perspective led investors to believe the issue was confined and unrelated to the Company's Active Life Reserves.

145.    Regardless, on this news, the Company's stock price fell more than 19 percent from $16.26 per share to $13.10, eliminating more than $1.5 billion in the Company's market capitalization.

146.    Analysts also took note of the surprising announcement.   Morgan Stanley commented that Genworth had previously created "the impression that prior long-term care challenges were behind the company" and that it had already "completed a comprehensive reserve analysis in the fourth quarter of [2013] and had downplayed the risk of reserve charge to investors."   Likewise, *Barron's* published an article noting the new review was announced "*just seven months after Genworth management had done a 'deep dive' into its [long-term care] reserves and given an 'all clear' determination to analysts.*"

147.    On July 30, 2014, the same day Genworth's second quarter results were announced, defendant McInerney appeared on Wall Street commentator Jim Cramer's CNBC television program *Mad Money* to discuss the stock drop.  He stated that the upcoming reserve review was limited to just 50,000 policies that were part of the DLR, and that the review would not impact Genworth's assessment of its ALR.  Defendant McInerney again minimized the significance of the Company's July 30, 2014 revelations and the upcoming reserve review, claiming that "there [wa]s confusion" in the marketplace about the Company's disclosures earlier in the day.  Defendant McInerney stressed that "we have a much larger active life reserve, which

is the reserve we hold for the bulk of the 1.2 million policyholders, and that reserve is about five times [larger than] the [disabled life reserves]."

148.    As investors would soon discover, these statements were part of an ongoing cover-up of significant accounting and reporting failures, which omitted material facts including, but not limited to, that the Company's active life reserves were also calculated at the time using the same outdated study from 2012 that relied on obsolete 2010 data.  The Company eventually admitted in a November 5, 2014 press release that its reserve review, including "changes to claim terminations ... will materially reduce its active life margins."

### E.   The Extent of Genworth's Problems Following the 2014 LTC Reserve Review Begins to Emerge During September 2014 Investor Conferences

149.    Genworth held investor conferences on September 4 and September 11, 2014 to address the ongoing issues facing Genworth.  During a September 4, 2014 investor conference, defendants McInerney and Klein again admitted Genworth had not conducted a complete review of its reserves in 2013, and had not conducted such a review since 2012. They explained that the Company's most recent review in 2012 did not account for years of critical post-May 2010 Genworth experience data.  Genworth needed to incorporate the post-May 2010 data into its reserve review, defendant Klein acknowledged, to "see if there is any change in trends or shifts in trends that we are seeing." The post-May 2010 data needed to be reviewed to determine, for example, if "assisted living facility times lengthen[ed]." Because "long term care trends are not static," defendant Klein explained, it was imperative for Genworth to review all available data and "continually update" the inputs to its reserve calculation—something it had not done in years.

150.    Contrary to misrepresentations made on July 30, 2014, defendant Klein now revealed that the disabled life reserve review could require a "corresponding or a related change"

to the Company's active life reserves. Since Genworth's active life reserves were substantially larger than its disabled life reserves, the revelation that a "corresponding charge" could be taken on the active life policies was significant. Defendant Klein admitted: "It has been a while since we have done a deep review."

151.    Defendant Klein also acknowledged that the deficiencies in Genworth's outdated reserve calculations could impact both Genworth's disabled and active life reserves, revealing that the reserve calculations could be so incorrect that Genworth's U.S. Life Insurance Division might not pay any dividend to the Genworth holding company in 2014. This was in stark contrast to the at least $200 million in dividends paid by the U.S. Life Insurance Division in 2012 and 2013, and was contrary to previous assertions to investors that Genworth should expect another dividend in 2014.

152.    On this news, the Company's stock price dropped 4 percent.

153.    One week later, on September 11, 2014, defendant McInerney admitted during another investor conference that "[t]he last time we did a major reserve review [which] include[ed] the disabled life reserve was in 2012." Defendant Klein chimed in and reiterated that the Company needed to incorporate the post-May 2010 data into its reserve review.

**F.   The True State of Genworth's Understated Reserves Is Finally Exposed**

154.    On November 5, 2014, the Company announced the results of the "comprehensive review of [Genworth's] long term insurance claim reserves." Genworth's post-May 2010 data showed the Company was materially under-reserved and needed to increase its reserves by $531 million. In addition, it needed to take an after-tax charge of $345 million in the quarter. The Company explained that this charge was the result of a review of post-May 2010 experience data, which forced it to make changes to "its assumptions and methodologies

51

primarily impacting claim terminations, most significantly in later duration claims, and benefit utilization reflecting that claimants are staying on claim longer and utilizing more of their available benefits in the aggregate than had previously been assumed in the Company's reserve calculations." This resulted in a loss of more than $360 million in net operating income for the third quarter of 2014.

155.   The associated charges caused Genworth to report its first quarterly loss for its LTC business in more than nine years – going from an average profit of $35 million during that time to a loss of $360 million. The reserve deficiency was so substantial that it also impacted the performance of the Company's overall U.S. Life Insurance Division. The charge reduced quarterly net operating income for the U.S. Life Insurance Division by 1,500 percent, increased the Company's expenses for the U.S. Life Insurance Division by 45 percent, and required the Company to take the first quarterly loss in its U.S. Life Insurance Division in more than two years.

156.   The charge was so significant it extinguished more than three years of Genworth's net operating income for its LTC business, and erased the Company's net operating income for its U.S. Life Insurance Division for all of 2014.

157.   The charge also had a severe, negative impact on the health of the entire Company. The charge drove the Company from an overall profit of $28 million for the quarter to a loss of $317 million. The charge reduced the Company's earnings-per share for the quarter by 1,380 percent, causing it to report an operating earnings-per-share loss of $0.64. This was its first recorded quarterly loss since June 2011.

158.   Moreover, the charge erased all of Genworth's net operating income year-to-date, and caused it to announce in November 2014 that it would "forego dividend payments from the life division for the remainder of 2014 and into 2015."

159.   The magnitude of Genworth's increase in its LTC reserves during the third quarter of 2014 was unprecedented.   Genworth never before had posted a quarterly increase in LTC reserves even remotely as large.   The Company's increase in LTC reserves during the quarter was more than triple any prior reserve increase since the Company began reporting its LTC reserves in 2006, and exceeded all of the Company's prior LTC insurance reserve increases during 2012 and 2013.

160.   The Company's review also had a material impact on the "loss ratio" that Genworth records on its LTC policies. "Loss ratio" is a critical financial metric for Genworth. It is calculated by dividing the "cost of providing benefits" by the "earned premiums" on its policies. In SEC filings, Genworth identified the "loss ratio" on its LTC policies as critical to an "understanding of the operating performance of our businesses."

161.   Throughout 2013, Genworth told investors the "loss ratio" for its LTC policies was between 60 and 70 percent. This metric is critical to an "understanding of the operating performance of [Genworth's] business."   Genworth's reported loss ratio of 60 to 70 percent indicated Genworth would profit from its policies, with "earned premiums" exceeding the "cost of providing benefits." In November 2014, however, Genworth disclosed the actual loss ratio for its policies was 173 percent - more than double what it previously had reported during the prior nine years. This trend would continue into the 4Q 14 as the Company saw its loss ratio grow 200 percent as the cost of providing benefits exceeded the earned premiums from the policies.

Indeed, Genworth's actual loss ratio reflected the fact that the Company was losing hundreds of millions of dollars on its LTC policies.

162.    Genworth's 2014 LTC reserve review, unlike its previous reviews, incorporated current data. The slide presentation used during the November 6, 2014 investor conference following the announcement of its 3Q 14 results, stated that, "importantly", the Company's November 2014 review incorporated all of the "approximately 3 years (June 2010 – December 2013) of claim data" not incorporated in its 2012 review (or the 2013 review, for that matter).

163.    On November 6, 2014, and in light of this news, Genworth's stock price dropped more than 38 percent, representing a market capitalization loss of $2.68 billion.  On the same day, S&P cut Genworth's credit rating to junk level.

164.    On December 17, 2014, the Company announced it was "still in the process" of reviewing its active life portfolio and the review would "tak[e] longer than previously anticipated."

### G.  In February 2015, the Individual Defendants Disclose Genworth's Reserve Problems Are Even Worse

165.    On February 10, 2015, Genworth posted a net loss of $760 million for 4Q 14, or $1.53 per share, fueled by costs to set aside more funds to cover claims on LTC policies.  These results included a charge of $478 million tied to LTC policies acquired before 1996.  The Company also wrote off the remaining goodwill at its life insurance and LTC business, recording costs of $274 million. With regard to its LTC insurance, the Company noted:

> Performance was unfavorable to the prior year primarily from the completion of the annual review of active life margins in the current quarter, but was also impacted by higher new claim severity assumptions resulting from the claim reserve review completed in the third quarter of 2014 in addition to higher frequency of new claims.

166. The Company's November 2014 charge was related to LTC policies with holders already drawing benefits. The February 2015 announcement, on the other hand, was focused on the group of customers not yet using their coverage.

167. Genworth stated that in the fourth quarter of 2014, it added $39 million to reserves and planned to add another $156 million to reserves over the next four years. Genworth posted a net loss of $1.24 billion in 2014, compared with 2013 profits of $560 million.

## THE INDIVIDUAL DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES TO THE COMPANY

168. The Individual Defendants knew, or were willfully ignorant in not knowing, that the Company's reserves were materially understated and its reserving practices were inadequate in connection with both the Australian IPO and its LTC business, and that its financial reports not were prepared in compliance with GAAP. As a result, the Individual Defendants caused and allowed Genworth to issue false and misleading statements for years.

169. Indeed, the Individual Defendants knew that delinquencies in the Australian MI unit were more likely than they were reporting, and that the Australian market was far from stable. In fact, from at least November 2011 through April 2012, the Individual Defendants were aware that the Australian market was deteriorating, yet they continued to cause Genworth to make false and misleading statements in order to protect the Australian IPO.

170. Notably, as alleged in the New York Class Action, the quarterly L&M meeting placed an emphasis on the importance of the Australian IPO to Genworth in order to free-up capital for Global MI, U.S. MI and other lines of business such as Long-Term Care. In addition, the Australian IPO was expected to enable the Company to buy back its own stock, thereby increasing the value of its shares.

171.    By December 2011, however, the tenor of these L&M meetings changed, when Schneider or Upton fielded a question at a meeting seeking an answer to whether the IPO was still planned for the early part of 2012. The response was negative, and the defendants cited the Australian MI unit's poor quarter, due to increased claims, which led to the miscalculation of reserves as the reason.  Surprisingly, claims were exceeding the allotted reserves.  During this meeting, a PowerPoint slide showed the increase in claims in Australia equaling around *$100-125 million.*

172.    Likewise, the Company's reserve practices failures were further displayed within the Company's LTC business, which was under-reserved despite the Individual Defendants' obligation to ensure Genworth maintained adequate internal controls over the LTC reserve calculations and the Company's financial reporting.

173.    In the face of numerous red flags, and despite their obligations, each Individual Defendant allowed the Company to use out-dated data, which produced an average claim duration more than 30 percent below what the current, and actual, data showed was necessary to determine an appropriate reserve level.  Further, the Individual Defendants allowed numerous public statements to be made, which relied on this stale data, in an effort to dramatically overstate the Company's financial results.

### A. The Individual Defendants Knowingly Allowed the Company to Issue Misleading Statements Regarding the Company's Core Operations

174.    As members of the Board, the Individual Defendants were obligated to be aware -- which they were --- of information utilized in computing reserves for delinquencies in the Australian market.  Still, in order to protect the Australian IPO, the Individual Defendants continued to allow the Company to represent to the market that the Australian market was "solid."

175.    On February 3, 2012, defendants Fraizer and Klein emphasized the importance of the IPO and stated that the IPO was on track. Defendant Fraizer confirmed that "we have not encountered *any regulatory or market conditions* that would change that timing." As late as *March 29*, 2012, defendant Klein answered a question specifically on the timing of the IPO by stating that "[w]e're working very actively to put ourselves in a position to execute this in the second quarter [of 2012]," and gave no indication that Genworth had encountered any obstacle to the IPO. Defendant Klein further reassured investors that "[w]hat we wanted to do all along is do this [IPO] transaction *from a position of strength*." Yet the Individual Defendants knew these statements were misleading as the Australian MI unit was facing serious challenges.

176.    Similarly, as members of the Board, the Individual Defendants were obligated to be aware of critical information utilized by the Company in computing LTC reserves, particularly since the Company's seemingly positive results for FY 2013 were achieved at a time when the LTC insurance industry was faltering.  Further, numerous industry experts and insurance companies publicly expressed concerns that LTC insurance providers had incorrectly priced and set reserves on their policies, and that defendants McInerney's and Klein's compensation was closely tied to the LTC business.  Aware of these and other red flags, the Individual Defendants' fiduciary duties required them to implement and maintain adequate internal controls to ensure that current claims data was utilized in calculating reserves, as required by GAAP. Each Individual Defendant failed in that duty.

177.    During the Relevant Period, Genworth was well aware that the average claim duration had increased to approximately three years, which resulted in higher costs per claim and reduced overall profitability.  The Company's year-end 2010 Form 10-K filed with the SEC on February 25, 2011 stated its "[l]ong-term care insurance claims typically have a duration of

approximately two to four years with an average duration of approximately three years." The Company's year-end 2011 Form 10-K, signed by defendant Klein and filed with the SEC on February 27, 2012, stated its "[l]ong-term care insurance claims typically have a duration of approximately two to five years with an average duration of approximately three years." The Company's Form 8-K filed on June 11, 2012 with the SEC and signed by defendant Klein, stated its "[l]ong-term care insurance claims typically have a duration of approximately two to five years with an average duration of approximately three years." The Company's year-end 2012 Form 10-K, signed by defendants McInerney and Klein and filed with the SEC on February 28, 2013, stated its "[l]ong-term care insurance claims typically have an average duration of approximately three years." The Company's Form 8-K, filed with the SEC on May 30, 2013, stated that its "[l]ong-term care insurance claims typically have a duration of approximately two to five years with an average duration of approximately three years." The Company's 2013 Form 10-K, signed by defendants McInerney and Klein on March 3, 2014, stated its "[l]ong-term care insurance claims typically have average duration of approximately three years."

178. The Company even published several reports that noted the average claim duration was approximately three years. On October 9, 2013, Genworth published a study titled "A Way Forward: Highlights from Beyond Dollars 2013," which it used to market its LTC policies. The study assessed "Genworth's claims data" from "December 1974 through June 30, 2012" and reflected that "the average claim lasts about three years." In an April 14, 2014 press release issued by the Company that discussed its "Genworth 2014 Annual Cost of Care Survey," the Company again noted that "[b]ased on Genworth's claims experience, the average length of a long term care claim is about three years." The press release also reflected that this statistic was based on recent data, identifying the following study as the source of the statistic: "Long Term

58

Care Claims Experience Data for Genworth Life Insurance Company and affiliates - December 1974 - June 30, 2013." Also, a September 9, 2014 Gannett News Service article reported that "Genworth Life Insurance Co., a leading provider of long-term-care insurance, says the average length of a long-term care insurance claim is 2.9 years based on reimbursement claims data from December 1974 through December 2013." Genworth and the Individual Defendants similarly urged potential policyholders during the Relevant Period to "have enough coverage to last ~3 years."

179.    Indeed, the LTC business was a core operation of the Company during the Relevant Period, and maintaining adequate reserves is a fundamental aspect of that business. Defendant McInerney claimed at the time that Genworth was "the undisputed leader in the long-term care industry," and declared LTC as one of the Company's two "core sets of businesses." The Individual Defendants were thus obligated to be aware of the Company's protocols and procedures regarding reserve practices, and thus should have been aware the Company's reserves were not being calculated using current claims data available to the Company.

180.    The Individual Defendants were further obligated to ensure the legitimacy of the review process and the adequacy of the reserves given the metric's close tie to defendants McInerney's and Klein's compensation. For 2013, McInerney received a bonus of $3 million, exceeding his target payout by 50 percent, which was based largely on him "developing, implementing and communicating to investors a strategy to improve performance of [Genworth's] long-term care insurance business." Likewise, defendant Klein received a bonus of $1.15 million for 2013, which exceeded his target payout by 48 percent, and similarly was based on his collaborating with other Genworth businesses and its investor relations arm to improve investor understanding of Genworth's LTC insurance business.

181.    Given the challenging business environment for LTC insurance companies during 2013, and the strong pecuniary incentive for defendants McInerney and Klein to overstate their success in turning around the Company's LTC business, the Individual Defendants were obligated to be aware of the figures used and the approach taken by the Company to calculate the reserve.  Moreover, the Individual Defendants had a duty to implement sufficient internal controls to ensure current claims data was used in calculating reserves. Each Individual Defendant breached this duty by either knowing, or willfully ignoring the fact, that Genworth was using an average claim duration that understated anticipated expenses more than 30 percent, and that the Company's reported results were overstated and not prepared in compliance with GAAP.

182.    As members of the Audit Committee, defendants Mead, Moloney and Riepe were additionally tasked with oversight of the 'integrity of the financial statements....and of the performance of the Company's internal Audit function[.]" Pursuant to the Audit Charter, defendants Parke, Mead, Moloney and Riepe were specifically required to, among other things:

- Discuss with management and the independent auditor the annual audited financial statements and quarterly financial statements;

- Discuss with management and the independent auditor, as appropriate, earnings press releases and financial information and earnings guidance provided to analysts and to rating agencies;

- Independently and/or in coordination with the Risk Committee, oversee risks associated with financial accounting and reporting, including the system of internal control, which includes reviewing and discussing with management and the independent auditor the company's risk assessment process and management policies with respect to the company's major financial risk exposures and the procedures utilized by management to identify and mitigate the exposure to such risks;

- Review the company's financial reporting and accounting standards and principles, significant changes in such standards or principles or in

their application and the key accounting decisions affecting the
company's financial statements;

- Review, with the CFO, the controller, the internal audit leader, or such
  others as the committee deems appropriate, the company's internal
  system of audit and financial controls and the results of internal audits,
  including significant internal audit findings;

183.  Defendants Parke, Mead, Moloney and Riepe were thus obligated to investigate
the basis for defendant McInerney's repeated claims during 2013 regarding the LTC review,
including the sufficiency of the reserves and the basis for that belief.

184.  Similarly, as members of the Risk Committee, defendants Moloney, Bolinder,
Conrad, Higgins and Moffett were specifically obligated to be aware of the Company's reserve
practices and were required to make certain Genworth maintained adequate internal controls.  As
per the Risk Charter, these individuals were tasked with assisting the Board to provide oversight
of "the Company's risk management policies and related risk profile, including but not limited to
credit risks, insurance risks, operational risks and any other risk that poses a material threat to the
viability of the Company."  This required each to:

- Review and oversee the control, management and mitigation
  processes relating to the Company's risk management policies
  and risk appetite;

- Review the Company's ability to assess and manage significant
  and emerging risks; and

- Review and analyze the Company's major risk exposures,
  strategies, processes, and policies;

185.  Thus, defendants Moloney, Bolinder, Conrad, Higgins and Moffett were obligated
to inquire into the basis for defendant McInerney's claims regarding the 2013 LTC review,
including the sufficiency of the reserves and the basis for that belief.  Again, this is particularly

true given the substantial risk Genworth faced from increasing claim durations, which drove many of the Company's competitors out of the industry entirely.

186.   Despite the duties to oversee Genworth's internal controls, the Individual Defendants allowed Genworth to calculate LTC reserves using faulty assumptions based on out-of-date data, and failed to correct or prevent misstatements issued by Genworth and defendants McInerney and Klein regarding the adequacy of the Company's reserves and the risks it faced. As described herein, the Individual Defendants caused and allowed investors to be misled by repeatedly representing that Genworth: (1) maintained adequate LTC reserves during the Relevant Period; (2) conducted a complete and thorough review of its reserves and reserve processes in 2013; (3) maintained adequate internal controls; and (4) issued financial statements that complied with GAAP. These statements were false and misleading when made and omitted material facts, including that the Company was actually dramatically under-reserved and that the reserve amounts were calculated using out-of-date average duration data.  These statements went uncorrected for months, meaning that any certification that "management has concluded that our internal control over financial reporting was effective as of December 31, 2013" was materially false and misleading, resulting in substantial damage to the Company.

**B.  The Individual Defendants Failed to Implement Adequate Accounting or Internal Controls**

187.   During the Relevant Period, Genworth failed to maintain adequate reserves for either its Australian MI or LTC business.

188.   By failing to properly estimate loss reserves regarding the Australian MI unit, the Australian MI falsified the financial results reported in Genworth's public financial statements for the third and fourth quarters of FY 2011 as well as for the year ended FY 2011. Defendants, in violation of GAAP, failed to estimate adequately the loss reserves reported on Genworth's

balance sheet, and the Company's corresponding loss reserve expenses were materially understated on its income statement. These GAAP violations resulted in a material overstatement of the Company's net income and EPS during the Relevant Period.

189. The Individual Defendants falsely represented that the financial information contained in the 2011 financial statements was a fair statement of the Company's financial results and that the results were prepared in accordance with GAAP throughout the Relevant Period. The financial information was not presented in accordance with GAAP, however, because the Company failed to establish sufficient loss reserves for its material exposure to high-risk low documentation loans from its 2007 and 2008 vintages, causing a $100-125 million increase in claims during the Relevant Period that exceeded the allotted reserves.

190. Under GAAP, a loss contingency is an existing condition, situation, or set of circumstances involving uncertainty as to possible loss that will ultimately be resolved when one or more future events occur or fail to occur. *See* ASC 450, *Contingencies*, at ASC 450-20-20. Genworth's established loss reserves were a loss contingency under GAAP because they represented the Company's estimate, at a certain point in time, of the ultimate costs of claims that the Company expected to pay in the future. GAAP requires that an estimated loss from a loss contingency be accrued, *i.e.*, recorded, by a charge to income if both the following conditions are met: (1) information available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements; and (2) the amount of loss can be reasonably estimated. *See* ASC-450-20-25-2.

191. Here, the Individual Defendants violated GAAP by failing to record adequate loss reserves for the Australian MI unit, disregarding negative facts and circumstances (i.e., red

flags), that were causing significant increases in claims for the Australian unit during the Relevant Period. The Individual Defendants' understatement of Australia's loss reserves resulted in a material overstatement of the Company's reported net income and EPS during the Relevant Period.

192. Similarly, GAAP requires that "[a]n expense or loss [must be] recognized if it becomes evident that previously recognized future economic benefits of an asset have been reduced or eliminated...." *See* Statement of Financial Accounting Concepts ("SFAC") No. 5, *Recognition and Measurement in Financial Statements of Business Enterprises*, ¶87. In addition, GAAP provides for the use of conservatism as a prudent reaction to uncertainty, to try to ensure that uncertainties and risks inherent in business situations are adequately considered. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent. SFAC No. 2, *Qualitative Characteristics of Accounting Information*, ¶¶95, 97. Several of Genworth's Relevant Period financial statements violated these basic rules of accounting.

193. Given the Individual Defendants' awareness of these negative factors, Genworth should have recorded a significant portion (if not the entirety) of the $82 million reserve charge announced *in 3Q 11 and 4Q 11*. In sum, the December 2011 L&M meeting, which disclosed that Genworth Australia had a poor quarter because of increased claims that were exceeding allotted reserves; the PowerPoint presentation at that meeting that revealed an increase in claims of $100-125 million; the susceptibility of the 2007/2008 low-documentation loans to a weak economy; the Australian MI unit's increasing delinquencies in the second half of 2011; and a significant increase in the number and severity of claims as early as November 2011, were all factors

available to the Individual Defendants that they failed adequately to account for when they established materially understated loss reserves during the Relevant Period.

194.    The Australian MI unit – considered one of the Company's highest return businesses – also played a significant role in Genworth's operations and profitability, contributing more than a quarter (or 26%) of the $478 million in dividend payments upstreamed by Genworth's subsidiaries to the holding company in 2011. Accordingly, the figures and financial reporting the Individual Defendants caused Genworth to present during the Relevant Period were material misstatements, quantitatively and qualitatively, under GAAP and SEC rules.

195.    Similar failures occurred with regard to Genworth's LTC reserving practices. During the Relevant Period, the Individual Defendants caused Genworth to claim it had internal controls that "provide[d] reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles." In reality, Genworth's internal controls suffered from grave deficiencies regarding its LTC reserve calculation that caused the Company's financial results to be materially misstated in violation of GAAP.

196.    Genworth's 2013 Annual Report on Form 10-K specifically stated that it had been prepared in accordance with GAAP, and that Genworth calculates and maintains reserves for estimated future payments of claims to policy and contract holders in accordance with GAAP and industry accounting practices. Genworth's financial statements, however, were materially misstated and not presented in accordance with GAAP.

197.    GAAP required Genworth to review its LTC experience data often to account for current data and known trends in updating reserves. GAAP prohibited Genworth from relying

on old data not reflective of current reality and precluded Genworth from doing occasional or cursory reserve reviews. *See* ASC 944-40-35-9 *and* ASC944-40-30-1.

198.    Instead, an in complete disregard of GAAP, the Individual Defendants caused Genworth to rely on old data not reflective of its current reality.  Genworth was required to update its reserve calculations because new experience data showed the factors underlying its reserves, such as claim duration, had changed. The Individual Defendants failed to ensure Genworth updated its reserve calculations in violation of GAAP which requires "liability for unpaid claims" to be "adjusted for current trends," and requires insurance companies to "adjust the additional liability balance" to account for "other evidence [which] suggests that earlier assumptions should be revised."

199.    The Individual Defendants allowed Genworth to falsely claim to "monitor actual experience, and when circumstances warrant, revise our assumptions." Genworth's claims experience showed an average claim duration of approximately 3 years, but Genworth used 2.2 years for average claims duration when calculating reserves.  The Individual Defendants thus failed to implement adequate internal controls to prevent an outdated average claim duration, which did not reflect actual experience, from being used in calculating reserve amounts, despite their knowledge that costs associated with increasing average claim durations were driving its competitors out of the LTC insurance business.

200.    On March 2, 2015, Genworth filed with the SEC its 2014 Annual Report on Form 10-K. In the 2014 Annual Report, Genworth admitted that it identified a "material weakness" in its internal control concerning the financial reporting related to its LTC insurance unit.  By disclosing a "material weakness," the Company conceded the Individual Defendants' failures to fulfill their fiduciary duty to maintain effective internal controls.

201.    In pertinent part, the Form 10-K filed on March 2, 2015 states as follows:

[W]e have concluded that we did not have adequate controls designed and in place to ensure that we correctly implemented changes made to one of our methodologies as part of our comprehensive long-term care insurance claim reserves review completed in the third quarter of 2014. As a result, we failed to identify a $44 million after-tax calculation error. Although this control deficiency did not result in a material misstatement in the consolidated financial statements, we have concluded a material weakness exists in the controls over the implementation of our long-term care insurance claim reserves assumption and methodology changes because such a misstatement could have occurred. We are currently working to remediate the material weakness . . . We cannot be sure when we will successfully remediate the material weakness or whether compensating controls will be effective before then in preventing or detecting material errors.

202.    The Individual Defendants willfully ignored these obvious and pervasive problems with fundamental reserving and report processes of Genworth's core business internal controls as alleged herein, and by deliberate and knowing indifference failed to make a good faith effort to correct the problems until it was too late, in violation of their fiduciary duties to the Company.

## SECURITIES CLASS ACTIONS NOW PENDING AGAINST GENWORTH SUSTAINED IN TWO DIFFERENT COURTS

203.    In April 2014, Genworth, Frazier, and Klein were named as defendants in the New York Class Action brought by, and on behalf of, investors who purchased securities of Genworth between November 3, 2011 and April 17, 2012 inclusive styled *In re Genworth Financial Inc. Securities Litigation,* No. 14-CV-02392 (AKH).

204.    Plaintiffs in the New York Class Action allege that defendants Frazier and Klein caused Genworth to violate federal securities laws by misleading investors regarding the financial health of the Australian MI units and reported false financial results understating

necessary reserves. By falsely assuring investors that the Australian housing market was "solid," defendants Frazier and Klein misled investors. Specifically, plaintiffs in the New York Class Action allege that Frazier and Klein engaged in a common plan or scheme to defraud investors by making false and misleading statements regarding the health of the Australian market in order to carry out the Australian IPO.

205. On June 16, 2015 the Hon. Alvin K. Hellerstein denied defendants motion to dismiss the New York Class Action in its entirety, finding that plaintiffs had adequately alleged control person liability because: (1) plaintiffs plead that defendants made material misstatements or omissions; (2) the second amended complaint filed in the New York Class Action raised a strong inference defendants Frazier and Klein acted intentionally, consciously, or recklessly; (3) the PSLRA's safe-harbor provision is inapplicable at this stage of litigation; and (4) that defendants carried out a common plan, scheme, and unlawful course of conduct that was intended to, and did deceive the investing public.

206. In August 2014, Genworth, McInerney and Klein were named as defendants in a Virginia Class Action brought by, and on behalf of, investors who purchased securities of Genworth between October 30, 2013 and November 5, 2014 styled *In re Genworth Financial Inc. Securities Litigation*, No. 3:14-CV-682-JRS. Plaintiffs in the Virginia Class Action allege that defendants McInerney and Klein controlled Genworth and caused it to violate the federal securities laws by misleading investors about the profitability of the Company's core business, LTC insurance, and reported false financial results by understating necessary reserves. By falsely assuring investors that they had closely studied "all aspects" of Genworth's LTC business and that Genworth was amply reserved, defendants McInerney and Klein misled investors.

207. Specifically, Plaintiffs in the Virginia Class Action similarly alleged that false and misleading statements were made when Genworth claimed that it: (a) had conducted a complete and thorough review of its LTC reserves and reserve processes in advance of the December 2013 Presentation; (b) used current claim data for its periodic financial statements and for its review in advance of the December 2013 Presentation; (c) concluded based on the 2013 review and internal controls that the its LTC reserves were adequate; (d) issued financial statements that were accurate and in accordance with GAAP; and (e) implemented the necessary internal controls to ensure that its reserves were based on a thorough review of current claim data.

208. On May 1, 2015, the Hon. James R. Spencer, Senior U.S. District Judge, denied in part the defendants' motion to dismiss the Virginia Class Action, finding plaintiff has adequately alleged violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934. Judge Spencer found the allegations were sufficient to state claims for securities fraud and control person liability because: (1) plaintiffs plead that defendants made material misstatements or omissions; (2) the amended complaint filed in the Virginia Class Action raised a strong inference that defendants McInerney and Klein acted intentionally, consciously, or recklessly; (3) the PSLRA's safe-harbor provision is inapplicable at this stage of litigation; and (4) with facts to support plaintiffs' claims of securities fraud, defendants McInerney and Klein can be held liable as control persons.

## DAMAGES TO THE COMPANY

209. As a result of the Individual Defendants' unlawful conduct described herein, Genworth disseminated false and misleading public statements concerning Genworth's LTC reserves, its reserving practices, its financial condition and its internal controls. These unlawful

statements have devastated Genworth's credibility as reflected by the Company's loss of hundreds of millions of dollars in market capitalization from the Relevant Period high.

210.    Further, as a direct and proximate result of the Individual Defendants' actions, Genworth has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

(a)         costs incurred from defending and paying any settlement in the securities class actions for violations of federal securities laws;

(b)         costs incurred from investigating the wrongdoing; and costs incurred from compensation and benefits paid to the defendants who have breached their duties to Genworth.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

211.    Plaintiff brings this action derivatively in the right and for the benefit of Genworth to redress injuries suffered, and to be suffered, by Genworth as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  Genworth is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

212.    Plaintiff will adequately and fairly represent the interests of Genworth in enforcing and prosecuting its rights.

213.    Plaintiff was a shareholder of Genworth at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is currently a Genworth shareholder.

214.    The current Board of Genworth consists of the following 10 defendants: McInerney, Bolinder, Conrad, Higgins, Karch, Mead, Moffett, Moloney, Parke and Riepe.

Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Defendant McInerney**

215. Demand on McInerney is excused. The Company's 2015 Proxy Statement filed with SEC on April 2, 2015 concedes defendant McInerney does not satisfy the New York Stock Exchange director independence standards due to his role as CEO of the Company.

216. As CEO, defendant McInerney made many of the statements relating to the Company's LTC business, in addition to others identified herein, that were false and misleading. Indeed, defendant McInerney is a defendant in the related Virginia Class Action. On May 1, 2015, the Hon. James R. Spencer, Senior U.S. District Judge, denied in part defendant McInerney's motion to dismiss the Virginia Class Action, finding the plaintiff has adequately alleged violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 against McInerney for issuing misleading statements regarding the profitability of the Company's core LTC business and the adequacy of the Company's reserves.

217. As a member of the Long-Term Care Steering Committee, defendant McInerney participated in weekly reviews regarding all aspects of the Company's LTC business and was thus aware of the true nature of the Company's LTC reserves review process. Moreover, defendant McInerney profited greatly from understating Genworth's liabilities. In April 2014, defendant McInerney received a bonus of $3 million for 2013, "which exceeded his 'target' payout by 50 percent. This "higher-than-expected incentive payout was largely based on [McInerney's] 'developing, implementing and communicating to investors a strategy to improve performance of our long-term care insurance business.'"

218.    As a member of the Board, defendant McInerney also signed various SEC filings attesting to the adequacy of Genworth's internal controls for its financial reporting and LTC reserves. On March 2, 2015, however, the Individual Defendants were forced to admit Genworth had material weaknesses in its internal controls despite previous assurances regarding the sufficiency of those controls.

219.    As a result of the foregoing, defendant McInerney faces a substantial likelihood of personal liability and could not exercise business judgment in good faith in response to a demand for an investigation that would further expose his role in issuing false and misleading statements and failing to implement adequate internal controls.

220.    Further, because McInerney is a named defendant in the Virginia Class Action it is not possible for him to consider a demand impartially. If the Company pressed forward with its rights of action against the defendants in this case, then the Company's efforts would undercut or even compromise the defense of the Virginia Class Action.

**Defendant Parke**

221.    Demand on defendant Parke is excused. Defendant Parke was the Chairperson of the Audit Committee during the Relevant Period when false statements were disseminated repeatedly to Genworth's shareholders. As described above, the Audit Committee is responsible for reviewing the integrity of the Company's accounting and reporting processes and financial information provided to shareholders and filed with the SEC. Defendant Parke breached his fiduciary duties, and his duties under applicable corporate charters, by causing the improper financial information to be included in the Company's SEC reports and press releases. Under these circumstances, he cannot respond to a demand in good faith.

222.    Furthermore, defendant Parke had a duty to ensure that appropriate measures were taken to fix and maintain the Company's internal control environment with regard to the Company's Australian MI unit and LTC reserves. That duty was breached. Indeed, defendant Parke was a member of the Board in early 2013 when it encouraged defendant McInerney, who had recently been appointed as the Company's CEO, to eliminate the LTC product entirely. Many of Genworth's direct competitors, including Prudential Group Insurance, MetLife and First Unum Life Insurance Company, exited the LTC market between 2010 and 2012 due to their concerns with the business. These concerns alerted, or should have alerted, defendant Parke and the rest of the Company's Board, requiring them to be skeptical of the financial results Genworth was claiming during the Relevant Period, particularly given that defendant McInerney's compensation was tied closely to LTC performance.

223.    Defendant Parke was a member of the Board during the class periods identified in both the New York Class Action and the Virginia Class Action.

224.    As a result, defendant Parke faces a substantial likelihood of personal liability for his failures and omissions during the Relevant Period, and is incapable of independently assessing a demand relating to the misconduct described herein in a disinterested manner.

**Defendant Mead**

225.    Demand on defendant Mead is excused. Defendant Mead was a member of the Audit Committee during the Relevant Period when false statements were disseminated to Genworth's shareholders. As described above, the Audit Committee is responsible for reviewing the integrity of the Company's accounting and reporting processes and financial information provided to shareholders and filed with the SEC. Defendant Mead breached her fiduciary duties, and her duties under the applicable corporate charters, by causing the improper financial

73

information to be included in the Company's SEC reports and press releases. Under these circumstances, she cannot respond to a demand in good faith.

226. Furthermore, defendant Mead had a duty to ensure that appropriate measures were taken to fix and maintain the Company's internal control environment with regard to the Company's Australian MI unit and LTC reserves. That duty was also breached. Indeed, defendant Mead was a member of the Board in early 2013 when it encouraged defendant McInerney, who had recently been appointed as the Company's CEO, to eliminate the LTC product entirely. Many of Genworth's direct competitors, including Prudential Group Insurance, MetLife and First Unum Life Insurance Company, exited the LTC market between 2010 and 2012 due to their concerns with the business. These concerns alerted, or should have alerted, defendant Mead and the rest of the Company's Board, requiring them to be skeptical of the financial results Genworth was claiming during the Relevant Period, particularly given that defendant McInerney's compensation was tied closely to LTC performance.

227. Defendant Mead was a member of the Board during the class periods identified in both the New York Class Action and the Virginia Class Action.

228. As a result, defendant Mead faces a substantial likelihood of personal liability for her failures and omissions during the Relevant Period, and is incapable of independently assessing a demand relating to the misconduct described herein in a disinterested manner.

**Defendant Moloney**

229. Demand on Moloney is excused. Defendant Moloney was a member of the Audit Committee during the Relevant Period when false statements were disseminated to Genworth's shareholders. The Audit Committee is responsible for reviewing the integrity of the Company's accounting and reporting processes and financial information provided to shareholders and filed

with the SEC. Defendant Moloney breached his fiduciary duties, and his duties under the applicable corporate charters, by causing improper financial information to be included in the Company's SEC reports and press releases. Under these circumstances, he cannot respond to a demand in good faith.

230. During the Relevant Period, defendant Moloney also served as Chairperson of Genworth's Risk Committee. As described above, the Risk Committee was tasked with assisting the Board in its oversight responsibilities relating to the Company's risk management policies and related risk profile, including but not limited to, credit risks, insurance risks, operational risks and any other risk that poses a material threat to the viability of the Company. The Board understood, well before it was ever revealed to the market, that the Australian MI unit and the LTC business presented a substantial risk to the Company. Defendant Moloney therefore was responsible for ensuring Genworth maintained controls sufficient to ensure adequate reserves were maintained during the Relevant Period, but failed in that duty.

231. Furthermore, defendant Moloney had a duty to ensure appropriate measures were taken to fix and maintain the Company's internal control environment with regard to its LTC reserves in light of the Board's concern with the entire LTC insurance business. That duty was also breached. Defendant Moloney was a member of the Board in early 2013 when it encouraged defendant McInerney, who had recently been appointed as the Company's CEO, to eliminate the LTC product entirely. Many of Genworth's direct competitors, including Prudential Group Insurance, MetLife and First Unum Life Insurance Company, exited the LTC market between 2010 and 2012 due to their concerns with the business. These concerns alerted, or should have alerted, defendant Moloney and the rest of the Company's Board, requiring them to be skeptical of the financial results Genworth was claiming during the Relevant Period,

particularly given that defendant McInerney's compensation was tied closely to LTC performance.

232. Defendant Moloney was a member of the Board during the class periods identified in both the New York Class Action and the Virginia Class Action.

233. As a result, defendant Moloney faces a substantial likelihood of personal liability for his failures and omissions during the Relevant Period, and is incapable of independently assessing a demand relating to the misconduct described herein in a disinterested manner.

**Defendant Riepe**

234. Demand on Riepe is excused. Defendant Riepe was a member of the Audit Committee during the Relevant Period when false statements were disseminated to Genworth's shareholders. As described above, the Audit Committee is responsible for reviewing the integrity of the Company's accounting and reporting processes and financial information provided to shareholders and filed with the SEC. Defendant Riepe breached his fiduciary duties, and his duties under the applicable corporate charters, by causing the improper financial information to be included in the Company's SEC reports and press releases. Under these circumstances, he cannot respond to a demand in good faith.

235. Furthermore, defendant Riepe had a duty to ensure appropriate measures were taken to fix and maintain the Company's internal control environment with regard to the Company's Australian MI unit and LTC reserves. That duty was also breached. Indeed, defendant Riepe was a member of the Board in early 2013 when it encouraged defendant McInerney, who had recently been appointed as the Company's CEO, to eliminate the LTC product entirely. Many of Genworth's direct competitors, including Prudential Group Insurance, MetLife and First Unum Life Insurance Company, exited the LTC market between 2010 and

2012 due to their concerns with the business. These concerns alerted, or should have alerted, defendant Riepe and the rest of the Company's Board, requiring them to be skeptical of the financial results Genworth was claiming during the relevant period, particularly given that defendant McInerney's compensation was tied closely to LTC performance.

236. Defendant Riepe was a member of the Board during the class periods identified in both the New York Class Action and the Virginia Class Action.

237. As a result, defendant Riepe faces a substantial likelihood of personal liability for his failures and omissions during the Relevant Period, and is incapable of independently assessing a demand relating to the misconduct described herein in a disinterested manner.

**Defendant Bolinder**

238. Demand on defendant Bolinder is excused. During the Relevant Period, defendant Bolinder served on Genworth's Risk Committee. As described above, the Risk Committee was tasked with assisting the Board in its oversight responsibilities relating to the Company's risk management policies and related risk profile, including but not limited to, credit risks, insurance risks, operational risks and any other risk that poses a material threat to the viability of the Company. The Board understood as early as January 2013 that the LTC business presented a substantial risk to the Company. Defendant Bolinder therefore was responsible for ensuring Genworth maintained controls sufficient to ensure adequate reserves were maintained during the Relevant Period, but failed in that duty.

239. Furthermore, defendant Bolinder had a duty to ensure that appropriate measures were taken to fix and maintain the Company's internal control environment with regard to the Company's Australian MI unit and LTC reserves. That duty was also breached. Indeed, defendant Bolinder was a member of the Board in early 2013 when it encouraged defendant

McInerney, who had recently been appointed as the Company's CEO, to eliminate the LTC product entirely. Many of Genworth's direct competitors, including Prudential Group Insurance, MetLife and First Unum Life Insurance Company, exited the LTC market between 2010 and 2012 due to their concerns with the business. These concerns alerted, or should have alerted, defendant Bolinder and the rest of the Company's Board, requiring them to be skeptical of the financial results Genworth was claiming during the Relevant Period, particularly given that defendant McInerney's compensation was tied closely to LTC performance.

240. Defendant Bolinder was a member of the Board during the class periods identified in both the New York Class Action and the Virginia Class Action.

241. As a result, defendant Bolinder faces a substantial likelihood of personal liability for his failures and omissions during the Relevant Period, and is incapable of independently assessing a demand relating to the misconduct described herein in a disinterested manner.

**Defendant Conrad**

242. Demand on defendant Conrad is excused. During the Relevant Period, defendant Conrad served on Genworth's Risk Committee. As described above, the Risk Committee was tasked with assisting the Board in its oversight responsibilities relating to the Company's risk management policies and related risk profile, including but not limited to, credit risks, insurance risks, operational risks and any other risk that poses a material threat to the viability of the Company. The Board understood as early as January 2013 that the LTC business presented a substantial risk to the Company. Defendant Conrad therefore was responsible for ensuring Genworth maintained controls sufficient to ensure adequate reserves were maintained during the Relevant Period, but he failed in that duty.

243.   Furthermore, defendant Conrad had a duty to ensure that appropriate measures were taken to fix and maintain the Company's internal control environment with regard to its LTC reserves in light of the Board's concern with the entire LTC insurance business. That duty was also breached. Defendant Conrad was a member of the Board in early 2013 when it encouraged defendant McInerney, who had recently been appointed as the Company's CEO, to eliminate the LTC product entirely. Many of Genworth's direct competitors, including Prudential Group Insurance, MetLife and First Unum Life Insurance Company, exited the LTC market between 2010 and 2012 due to their concerns with the business. These concerns alerted, or should have alerted, defendant Conrad and the rest of the Company's Board, requiring them to be skeptical of the financial results Genworth was claiming during the Relevant Period, particularly given that defendant McInerney's compensation was tied closely to LTC performance.

244.   As a result, defendant Conrad faces a substantial likelihood of personal liability for his failures and omissions during the Relevant Period, and is incapable of independently assessing a demand relating to the misconduct described herein in a disinterested manner.

**Defendant Higgins**

245.   Demand on Higgins is excused.  During the Relevant Period, defendant Higgins served on Genworth's Risk Committee.  As described above, the Risk Committee was tasked with assisting the Board in its oversight responsibilities relating to the Company's risk management policies and related risk profile, including but not limited to, credit risks, insurance risks, operational risks and any other risk that poses a material threat to the viability of the Company. The Board understood as early as January 2013 that the LTC business presented a substantial risk to the Company.  Defendant Higgins therefore was responsible for ensuring

79

Genworth maintained controls sufficient to ensure adequate reserves were maintained during the relevant period, but failed in that duty.

246. Furthermore, defendant Higgins had a duty to ensure that appropriate measures were taken to fix and maintain the Company's internal control environment with regard to its LTC reserves in light of the Board's concern with the entire LTC insurance business. That duty was also breached. Defendant Higgins was a member of the Board in early 2013 when it encouraged defendant McInerney, who had recently been appointed as the Company's CEO, to eliminate the LTC product entirely. Many of Genworth's direct competitors, including Prudential Group Insurance, MetLife and First Unum Life Insurance Company, exited the LTC market between 2010 and 2012 due to their concerns with the business. These concerns alerted, or should have alerted, defendant Higgins and the rest of the Company's Board, requiring them to be skeptical of the financial results Genworth was claiming during the relevant period, particularly given that defendant McInerney's compensation was tied closely to LTC performance.

247. As a result, defendant Higgins faces a substantial likelihood of personal liability for her failures and omissions during the Relevant Period, and is incapable of independently assessing a demand relating to the misconduct described herein in a disinterested manner.

**Defendant Moffett**

248. Demand on Moffett is excused. During the Relevant Period, defendant Moffett served on Genworth's Risk Committee. As described above, the Risk Committee was tasked with assisting the Board in its oversight responsibilities relating to the Company's risk management policies and related risk profile, including but not limited to, credit risks, insurance risks, operational risks and any other risk that poses a material threat to the viability of the

Company. The Board understood as early as January 2013 that the LTC business presented a substantial risk to the Company.  Defendant Moffett therefore was responsible for ensuring Genworth maintained controls sufficient to ensure adequate reserves were maintained during the Relevant Period, but failed in that duty.

249.   Furthermore, defendant Moffett had a duty to ensure that appropriate measures were taken to fix and maintain the Company's internal control environment with regard to its LTC reserves in light of the Board's concern with the entire LTC insurance business.  That duty was also breached.  Indeed, defendant Moffett was a member of the Board in early 2013 when it encouraged defendant McInerney, who had recently been appointed as the Company's CEO, to eliminate the LTC product entirely. Many of Genworth's direct competitors, including Prudential Group Insurance, MetLife and First Unum Life Insurance Company, exited the LTC market between 2010 and 2012 due to their concerns with the business.  These concerns alerted, or should have alerted, defendant Moffett and the rest of the Company's Board, requiring them to be skeptical of the financial results Genworth was claiming during the Relevant Period, particularly given that defendant McInerney's compensation was tied closely to LTC performance.

250.   As a result, defendant Moffett faces a substantial likelihood of personal liability for his failures and omissions during the relevant period, and is incapable of independently assessing a demand relating to the misconduct described herein in a disinterested manner.

**Defendant Karch**

251.   Demand on Karch is excused. Defendant Karch has been a director since 2005 and therefore a member of a the Board during the events that lead to both the New York Class Action and Virginia Class Action.

252.    Moreover, defendant Karch was a signatory, through her attorney-in-fact defendant McInerney 2013 Annual Report on Form 10-K.  Defendant Karch was a member of the Board in early 2013 when it encouraged defendant McInerney, who had recently been appointed as the Company's CEO, to eliminate the LTC product entirely.  Many of Genworth's direct competitors, including Prudential Group Insurance, MetLife and First Unum Life Insurance Company, exited the LTC market between 2010 and 2012 due to their concerns with the business.  These concerns alerted, or should have alerted, defendant Karch and the rest of the Company's Board, requiring them to be skeptical of the financial results Genworth was claiming during the relevant period, particularly given that defendant McInerney's compensation was tied closely to LTC performance.

253.    Defendant Karch was a member of the Board during the class periods identified in both the New York Class Action and the Virginia Class Action.

254.    As a result, defendant Karch faces a substantial likelihood of personal liability for her failures and omissions during the Relevant Period, and is incapable of independently assessing a demand relating to the misconduct described herein in a disinterested manner.

<u>COUNT I</u>

**BREACH OF FIDUCIARY DUTY FOR DISSEMINATING FALSE AND MISLEADING INFORMATION**

255.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

256.    As alleged in detail herein, each of the Individual Defendants had a duty to ensure that Genworth disseminated accurate, truthful and complete information to its shareholders.

257.    The Individual Defendants violated their fiduciary duties of care, loyalty, and good faith by causing, or allowing, the Company to disseminate to Genworth shareholders

materially misleading and inaccurate information through, *inter alia*, SEC filings and other public statements and disclosures as detailed herein, including overstatements regarding the Australian IPO and the Company's LTC review, the adequacy of its LTC reserves, and the sufficiency of its internal controls. Causing and allowing these misstatements to occur could not have been a good faith exercise of prudent business judgment.

258.     The Individual Defendants also caused and allowed Genworth to issue financial statements that did not comply with GAAP.  GAAP specifically required the Company to review Genworth's data often and update it in accordance with actual experience, and each Individual Defendant was obligated to ensure that the Company used current data and to account for known trends in updating reserve amounts.

259.     As a direct and proximate result of Individual Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

## COUNT II

## BREACH OF FIDUCIARY DUTIES FOR FAILING TO MAINTAIN INTERNAL CONTROLS

260.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

261.     As alleged herein, each of the Individual Defendants had a fiduciary duty to, among other things, exercise good faith to ensure that the Company maintained adequate internal controls and, when put on notice of problems with the Company's business practices and operations, including specific knowledge that Genworth failed to accurately calculate reserves, each Individual Defendant was required to exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

262.   The Individual Defendants willfully ignored the obvious and pervasive problems with Genworth's internal controls practices and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

263.   As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages.

## COUNT III
### BREACH OF FIDUCIARY DUTIES FOR FAILING TO PROPERLY OVERSEE AND MANAGE THE COMPANY

264.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

265.   Individual Defendants owed and owe Genworth fiduciary obligations.  By reason of their fiduciary relationships, Defendants specifically owed and owe Genworth the highest obligation of good faith, fair dealing, loyalty and due care.

266.   Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

267.   As a direct and proximate result of Individual Defendants' failure to perform their fiduciary obligations, Genworth has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

268.   As a result of the misconduct alleged herein, Defendants are liable to the Company.

269.   Plaintiff, on behalf of Genworth, has no adequate remedy at law.

## COUNT IV

### UNJUST ENRICHMENT

270.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

271.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense and to the detriment of Genworth.

272.    Plaintiff, as a shareholder and representative of Genworth, seeks restitution from these Individual Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Against all Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Individual Defendants' breaches of fiduciary duties;

B.    Directing Genworth to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

C.     Awarding to Genworth restitution from Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: August 7, 2015.

_____
Jeffrey H. Geiger
SANDS ANDERSON PC
P.O. Box 1998
Richmond, VA 23218-1998
Telephone: (804) 783-7248
Fax: (804) 783-7291
E-Mail: jgeiger@sandsanderson.com

**HOLZER & HOLZER, LLC**

Corey D. Holzer (subject to admission *pro hac vice*)
1200 Ashford Parkway, Suite 410
Atlanta, GA 30338
Telephone: (770) 392-0090
Fax: (770) 392-0029

**THE WEISER LAW FIRM, P.C.**
Robert B. Weiser (subject to admission *pro hac vice*)
Brett D. Stecker (subject to admission *pro hac vice*)
James M. Ficaro (subject to admission *pro hac vice*)
22 Cassatt Avenue
First Floor
Berwyn, PA 19312
Telephone:  (610) 225-2677
Facsimile:  (610) 408-8062

86

## GENWORTH FINANCIAL, INC. VERIFICATION

I, David Pinkoski, hereby verify that I am familiar with the allegations in the Complaint, and that I have authorized the filing of the Complaint, and that the foregoing is true and correct to the best of my knowledge, information, and belief.

Date: 7-25-2015

David Pinkoski
David Pinkoski